262

55 A.3d 1108

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Manuel Marcus SEPULVEDA, Appellant.**

Supreme Court of Pennsylvania.

Submitted July 25, 2008.

Decided Nov. 28, 2012.

268

Keisha Nicole Hudson, Defender Association of Philadelphia, Elizabeth Ann Larin, Federal Community Defender Office, Eastern District of PA, Michael Wiseman, Philadelphia, for Manuel Marcus Sepulveda.

Mark S. Matthews, Monroe County District Attorney's Office, Amy Zapp, PA Office of Attorney General, Harrisburg, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Chief Justice CASTILLE.[1]

This is a capital appeal from the order of the Court of Common Pleas of Monroe County denying appellant Manuel Marcus Sepulveda's petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546. For the reasons that follow, we remand for further, limited proceedings before the PCRA court.

## A. BACKGROUND

The facts underlying appellant's sentences of death are discussed more fully in appellant's direct appeal, *Commonwealth v. Sepulveda*, 579 Pa. 217, 855 A.2d 783, 786–89 (2004) (plurality), cert. *denied*, 546 U.S. 1169, 126 S.Ct. 1330, 164 L.Ed.2d 47 (2006). However, in order to adequately review appellant's claims herein, some background is required.

The evidence adduced at trial and summarized in *Sepulveda* established that on November 26, 2001, appellant was at the home of Daniel Heleva and Robyn Otto in Polk Township, Monroe County, where he resided with the couple and their two children. At approximately 6:30 p.m., John Mendez and Ricardo Lopez arrived at the house to recover two guns that Mendez claimed belonged to him. Appellant retrieved the guns and gave them to Mendez. Mendez and Lopez then left.

Later that night, Heleva returned to the house with Richard Boyko and discovered that the guns were missing. Another man, Jimmy Frey, was sitting in the living room watching television. Appellant explained to Heleva what happened with

1. This matter was reassigned to this author.

the guns and Heleva instructed Boyko to call Mendez. Mendez and Lopez returned to the house, but Heleva did not initially permit Lopez to enter. Heleva and Mendez had words and the two men began fighting in the kitchen. The fight was resolved and Lopez and appellant joined Mendez and Heleva in the kitchen. Boyko left the house to run an errand for Robyn Otto. Robyn Otto was upstairs in the house with her two children.

As the four men were sitting around the kitchen table, another argument erupted, at which point appellant grabbed a .12 gauge shotgun and shot Mendez in the stomach. He then shot Lopez in the side. Lopez collapsed on the floor. Appellant then placed the gun on Lopez's back and fired, killing him. Mendez escaped from the kitchen and ran upstairs. Appellant then chased him upstairs where he shot him a second time. Mendez was able to exit the house and flee to a neighbor's house. Appellant and Heleva followed him, entered the neighbor's property, seized Mendez, and dragged him back to Heleva's house. Meanwhile, Frey, who had been watching the incident, hid the shotgun in a sofa. After the men dragged Mendez back to the house, appellant struck him with a hatchet type of weapon, killing him. There was no evidence that either victim had, or displayed, a firearm when appellant murdered them.

In the interim, police received a 911 call from Heleva's neighbor, reporting a domestic disturbance. When the police arrived at Heleva's home, appellant initially denied knowledge of the incident, but then said he was assaulted by two men. The police placed appellant in the back of a police car, handcuffed him, and asked him where the woman was, since they still believed it was a domestic disturbance. Appellant responded: "There is no she. They are in the basement. I shot them." Police found the dead bodies of Lopez and Mendez in the basement. The police found Lopez beneath slabs of insulation and dry wall material, with his pants pulled to his ankles. They found Mendez beneath a pile of laundry, stripped naked with his thumb in his mouth and with a rubber

bungee cord wrapped tightly around his neck. *See Sepulveda,* 855 A.2d at 787, n. 6.

Police brought appellant to the State Police Barracks in Lehighton, at which time appellant gave multiple statements. The statements were inconsistent. Appellant initially accepted responsibility for the killings, but in a written statement he admitted to shooting Lopez only one time, placing blame for the second shot on Heleva. Appellant also admitted to shooting Mendez, but again placed the blame for the blows to Mendez's head on Heleva. These statements will be discussed in more detail *infra,* as they are relevant to one of appellant's PCRA issues.

At trial, appellant took the stand and testified to a version of events that was mostly consistent with his written police statement, with two notable exceptions.[2] Appellant also presented evidence supporting the lesser offense of voluntary manslaughter, suggesting that he was acting in defense of Heleva and Heleva's children at the time of the killings.

After the close of the guilt phase of appellant's capital trial, a jury sitting before the Honorable Ronald E. Vican convicted appellant of two counts of first-degree murder for the shooting deaths of Ricardo Lopez and John Mendez.[3] Following a penalty hearing, the jury found one aggravating circumstance at each count, which it determined outweighed the two mitigating circumstances it found at each count, and returned two sentences of death.[4] *See* 42 Pa.C.S. § 9711(c)(1)(iv)("[T]he

2. First, in his written statement appellant represented that he heard the second shot that killed Lopez as appellant was chasing Mendez through the upstairs of the house. At trial, however, appellant testified that he saw Heleva shoot Lopez the second time. Second, in his written statement appellant stated that he grabbed the gun away from Mendez and Heleva as they struggled, turned the gun toward Mendez, and shot him in the arm. At trial, appellant testified that when he shot Mendez in the arm, he did so accidentally in an attempt to wrestle the gun away from the two men. *See Sepulveda, supra.*

3. The jury also convicted appellant of two counts of aggravated assault, criminal conspiracy, unlawful restraint, and tampering or fabricating evidence.

4. The aggravating circumstance found by the jury was that appellant was convicted of another murder committed "before or at the time of

verdict must be a sentence of death . . . if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances."). This Court affirmed on direct appeal. *Sepulveda*, 855 A.2d at 794.

Appellant filed a *pro se* PCRA petition on August 9, 2006, and President Judge Vican appointed new counsel. This appointment was rescinded after the Philadelphia-based Federal Community Defender Office ("FCDO"), Capital Habeas Unit unilaterally entered its appearance.[5] Federal counsel then filed a lengthy amended petition, alleging numerous claims of trial court error and ineffective assistance of counsel. The PCRA court conducted an evidentiary hearing over four separate days. Following the hearing, the court denied relief. Appellant appealed to this Court.[6]

We summarize appellant's prolix issues as follows: (1) whether counsel was ineffective in failing to investigate and present mental health evidence to support claims of diminished mental capacity, imperfect belief of defense of others, and mitigating evidence; (2) whether counsel was ineffective in failing to challenge the Commonwealth's peremptory challenges of potential jurors; (3) whether counsel was ineffective in failing to properly question potential jurors who were excused because they expressed doubts about imposing the death penalty; (4) whether counsel was ineffective in challenging appellant's inculpatory statements; (5) whether the jury was presented with materially false evidence by the Commonwealth and whether trial counsel was ineffective for failing to present an expert to dispute this evidence; (6) whether counsel was ineffective in failing to object to victim impact evidence; (7) whether error in the guilt phase jury instructions violated appellant's due process rights; (8) whether counsel

---

the offense at issue," 42 Pa.C.S. § 9711(d)(11). The mitigating circumstances found by one or more jurors were that appellant had "no significant history of prior criminal convictions," *id.*, § 9711(e)(1), and his age (22) when he committed the murders. *Id.*, § 9711(e)(4).

5. The issue arising from the FCDO's actions in this case is addressed later in this Opinion, in Part C.

6. The appeal of the PCRA court's order in a capital matter is directly reviewable by this Court pursuant to 42 Pa.C.S. § 9546(d).

had a conflict of interest; (9) whether appellant's rights were violated because no transcript exists of portions of his trial; and (10) whether the cumulative effect of the alleged errors warrants relief.[7]

■ In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination "is supported by the record and free of legal error." *Commonwealth v. Rainey*, 593 Pa. 67, 928 A.2d 215, 223 (2007). To be entitled to PCRA relief, appellant must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the enumerated errors in 42 Pa.C.S. § 9543(a)(2), his claims have not been previously litigated or waived, and "the failure to litigate the issue prior to or during trial . . . or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel." 42 Pa.C.S. § 9543(a)(3), (a)(4). An issue is previously litigated if "the highest appellate court in which [appellant] could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2). An issue is waived if appellant "could have raised it but failed to do so before trial, at trial, . . . on appeal or in a prior state post conviction proceeding." 42 Pa.C.S. § 9544(b).

■ In order to obtain relief on a claim of ineffectiveness, a PCRA petitioner must satisfy the performance and prejudice test set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In Pennsylvania, we have applied the *Strickland* test by looking to three elements:

7. Appellant also alleges, as a separate claim and incorporated throughout his other claims, that all prior counsel were ineffective in failing to raise the claims he now raises, thus attempting to layer his ineffectiveness claims. However, *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), abrogated the rule that ineffectiveness claims must be raised at the first opportunity where a defendant has new counsel. In any event, even under the pre-*Grant* rule, appellant was not required to raise ineffectiveness claims until he obtained new counsel, *see Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977). In this case, appellant was represented by Marshall Anders, Esquire, who was joined by another lawyer (hereafter "co-counsel") from his firm for purposes of the direct appeal. Because the same counsel represented appellant at trial and on direct appeal, collateral review is appellant's first opportunity to raise claims sounding in trial counsel's ineffectiveness.

the petitioner must establish that: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's error such that there is a reasonable probability that the result of the proceeding would have been different absent such error. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 975 (1987). Additionally, we note, the Sixth Amendment right to counsel is recognized "not for its own sake," but because of the effect it has on the accused's right to a fair trial. *See Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993); *see also Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. For these reasons, counsel is presumed to have rendered effective assistance. Finally, both the U.S. Supreme Court and this Court have made clear that a court is not required to analyze the elements of an ineffectiveness claim in any particular order of priority; instead, if a claim fails under any necessary element of the *Strickland* test, the court may proceed to that element first. *Strickland, supra; .Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693, 701 (1998). Counsel cannot be deemed ineffective for failing to raise a meritless claim. *Commonwealth v. Jones*, 590 Pa. 202, 912 A.2d 268, 278 (2006).

We now address appellant's claims.

## B. *APPELLANT'S CLAIMS*

### 1. *INEFFECTIVE INVESTIGATION AND PRESENTATION OF MENTAL HEALTH EVIDENCE*

Appellant first claims that he suffered from severe mental and emotional disorders, and that counsel was ineffective in failing to investigate and present evidence concerning his mental health issues at both phases of his trial. Appellant alleges that counsel should have spoken with people familiar with his childhood and obtained his background records. Appellant faults counsel for waiting until two weeks before trial to consult a mental health expert, and for not having any mental health expert personally examine him. Appellant fur-

ther contends that counsel should have reviewed appellant's pre-trial prison records, as they would have indicated that he had mental health issues. Specifically, appellant contends that records from the Monroe County Correctional Facility of his pre-trial detention indicate that he requested mental health treatment and complained of trouble sleeping and hallucinations.[8]

At the PCRA hearing, federal counsel produced numerous witnesses who testified concerning appellant's mental health, and concerning counsel's performance in developing mental health-related claims. The Commonwealth did not present any witnesses, but cross-examined appellant's witnesses.

Yolanda Maisonet, appellant's mother, Alex Sepulveda, appellant's cousin, and Juan Ramon Rivera, appellant's maternal uncle, testified that appellant grew up in a poorly maintained apartment building in a drug-infested and violent neighborhood in New York City. Maisonet and Rivera recounted that appellant's father was an alcoholic, who frequently gambled and physically abused both appellant's mother and appellant. When appellant was eight or nine years old, Maisonet moved with her children to Puerto Rico, to a neighborhood scarred by violence and illicit drugs. Maisonet testified that appellant had trouble concentrating on his school work, falling one class short of graduating from high school. On cross-examination, Maisonet stated that appellant corresponded with her prior to trial, but did not inform her that he was facing a potential death sentence. Nor did appellant ask for her assistance in his defense. On cross-examination, Rivera also testified that appellant never asked him to assist in his defense. Alex Sepulveda testified that mental illness and addiction ran in his family. Sepulveda testified that appellant never contacted him before trial, although Sepulveda was an attorney, and

8. The issue related to the pre-trial detention records was not raised in appellant's initial or amended petition. Appellant filed a Motion to Amend his amended petition, seeking to include a claim of trial counsel's ineffectiveness related to the pre-trial prison records. The PCRA court granted the Motion to Amend pursuant to Pa.R.Crim.P. 905(A) in its opinion denying appellant's PCRA petition. *See* PCRA Court Opinion, 10/11/2007, at 3–5.

family members often sought his legal assistance. *See* N.T., 6/11/07, at 122–143; *id.* at 144–58; N.T., 6/12/07, at 6–22.

Robyn Otto was with appellant prior to and during the murders. At the PCRA hearing, Otto testified to appellant's habitual cocaine use, including on the night of the murders. *See* N.T., 6/11/07, at 12–15.

Heather Mirel testified at the PCRA hearing that appellant used crack cocaine on a daily basis. She said that appellant became agitated and paranoid when he used crack cocaine, and that his drug use cost him his job. However, Mirel related that appellant never became violent while using drugs. *See* N.T., 6/12/07, at 85–92.

Juan Pena, appellant's friend, testified that after living in Puerto Rico, appellant returned to New York and lived with his father, during which time appellant regularly smoked marijuana. After moving to Pennsylvania, appellant continued using marijuana and began to abuse crack cocaine. Pena said that appellant became paranoid while using crack cocaine. On cross-examination, Pena admitted that he never attempted to contact appellant or his counsel after the murders. *See id.* at 93–106.

Deanna Flowers testified that appellant became paranoid and delusional while on crack cocaine, but also stated that he was never violent. *See id.* at 112–20.

Federal counsel also produced testimony from a number of mental health experts at the PCRA hearing. Dr. Antonio Puente, a neuropsychologist, interviewed and performed neuropsychological testing on appellant. Dr. Puente also talked with Alex Sepulveda and reviewed records from appellant's childhood. Dr. Puente described how, in his opinion, appellant's upbringing impaired his brain development and academic and intellectual capacity. He concluded that appellant suffered neuropsychological deficits which impaired his ability to reason, solve problems, make judgments, premeditate, and deliberate. Looking back in time, Dr. Puente also opined that appellant suffered from extreme mental or emotional disturbance at the time of the murders, and that his ability to

conform his conduct to the requirements of the law was substantially impaired. Dr. Puente testified that information regarding the domestic violence that appellant experienced, including that appellant's father hit the children, indicated that further psychiatric evaluation was appropriate. Likewise, he testified that appellant's school records, prison records, and information regarding the domestic violence appellant experienced were indicators of a need for further psychiatric evaluation. *See id.* at 29–65. However, on cross-examination, Dr. Puente also acknowledged that the information that trial counsel actually possessed regarding appellant's upbringing "would not have been enough to raise red flags." *Id.* at 75.

Dr. Pablo Stewart, a psychiatric consultant, conducted a forensic psychiatric examination of appellant, reviewed appellant's prison records, and met with appellant. Dr. Stewart also reviewed affidavits from, and met with, Maisonet, Rivera, and Rivera's wife. Dr. Stewart opined that appellant suffered from post-traumatic stress disorder (PTSD) caused by his troubled upbringing. Dr. Stewart noted that hypervigilance is a PTSD symptom; in his view, such a symptom would cause a PTSD sufferer to be more likely to react against perceived threats. Dr. Stewart also noted that PTSD includes "avoidance," a symptom he believed was reflected in appellant's case by his refusal to discuss the traumatic events in his life. Furthermore, Dr. Stewart opined that PTSD limited appellant's social and occupational development. Dr. Stewart admitted that appellant was not forthcoming, and that it was his training and experience in psychiatry that enabled him to notice appellant's indicia of PTSD. Dr. Stewart opined that the fact that a criminal defendant experienced a history of abuse, but did not want his family involved in his defense, was an indicator for PTSD. Dr. Stewart further diagnosed appellant with polysubstance dependence and substance-induced psychotic disorder, which manifests as auditory hallucinations, visual hallucinations, and paranoia. Dr. Stewart also opined that appellant suffered cognitive disorder not otherwise specified ("NOS"), also known as organic brain damage. Ultimately, Dr. Stewart opined that appellant suffered from extreme

mental or emotional disturbance, and, looking backward, that "the combination of these conditions did, in fact, cloud his mind to the extent he was unable to deliberate and premeditate" and impaired his ability to form a specific intent to kill. *See* N.T., 6/11/07, at 85–86; *see also id.* at 36–97.

A third FCDO-secured mental health expert, Dr. Richard Dudley, a psychiatrist, met with appellant for a cumulative period of twenty hours, and reviewed records and affidavits from appellant's family. Dr. Dudley diagnosed appellant with chronic PTSD, cognitive disorder NOS, polysubstance abuse, and cocaine-induced psychotic disorder. Dr. Dudley opined that appellant suffered from avoidance and hypervigilance, as well as extreme mental or emotional disturbance. Looking backward, Dr. Dudley concluded that appellant lacked the ability to deliberate or premeditate on the night of the murder. *See* N.T., 6/13/07, at 5–43, 54.

Dr. Eric Fine, a psychiatrist, testified that trial counsel had consulted him immediately prior to appellant's trial to render an opinion regarding appellant's state of mind at the time of the offense. Dr. Fine saw counsel's request as "being a very specific request for information regarding the effect of cocaine. It was not requested that I evaluate [appellant] in terms of his past medical and psychiatric history and everything else that would have gone into a comprehensive psychiatric evaluation." N.T., 6/11/07, at 109. Dr. Fine testified that he believed that an in-person evaluation was unnecessary. He concluded that, "while [appellant] might have had impairment of judgment, and possibly some degree of confusion, the material reviewed does not support a conclusion, within a reasonable degree of medical certainty, that he would have been unable to form the specific intent to kill the victims." Dr. Fine noted that it would have been helpful for him to review additional materials, and appellant's pre-trial prison records could have indicated whether appellant was then displaying psychotic symptoms. *See id.* at 115–19.

Trial counsel's paralegal testified that she interviewed appellant before trial and asked him for information regarding his upbringing. The paralegal drafted a memorandum for

counsel dated November 4, 2002, recounting her October 30, 2002 meeting with appellant. At that time, appellant provided the paralegal with general background information related to when and where he was born, where he resided, and his schooling.[9] The paralegal recalled that appellant was forthcoming with the information, but she also noted that appellant was "adamant" that counsel not contact his mother. *See* N.T., 6/12/07, at 132–36.

Finally, appellant's trial counsel testified, noting that he was appointed to represent appellant eight months before trial. Appellant informed counsel that his father was abusive, but counsel did not consider this fact to be mitigating evidence because appellant never indicated that he (appellant) had been abused. Counsel further testified that he would have contacted appellant's family, but appellant instructed him not to do so. *See* N.T., 3/7/07, at 18–21. Indeed, counsel observed that appellant had specifically asked him not to contact his family and refused to facilitate such contact:

[H]e wanted to keep his family out of court, out of the situation. He would not provide me with any information as to where I could locate his family or otherwise obtain background records. I asked [him] on more than one occasion to provide me with ... names and addresses of family. I wanted family here. He didn't want them involved.

*Id.* at 18.

### a. Guilt Phase Mental Health Evidence

Appellant claims that counsel's alleged deficient investigation and presentation of mental health evidence damaged his

9. The paralegal's memorandum also indicated that there was some family dysfunction, indicating that appellant's father was abusive towards his mother and sister. *See also* N.T., 3/7/07, at 20 (counsel's testimony acknowledging that paralegal's memorandum stated that appellant's father "did hit the children occasionally; once the father hit [appellant's] sister so hard that he broke her tooth and she had to go to the hospital. Due to that incident, her mother hit [the father] over the head with a baseball bat."). The memorandum further stated that appellant's father was still residing in the same house in which appellant was raised.

guilt-phase case in two distinct respects. First, appellant contends that counsel was ineffective in failing to present evidence of his cocaine-induced psychosis,[10] as well as his mental health and emotional impairments, including PTSD and hypervigilance, arguing that these factors impaired his judgment and would have provided further support for the imperfect belief of defense of others theory that counsel argued to the jury.[11] In the alternative, appellant argues that counsel was ineffective for failing to present a diminished capacity defense to the jury.

The Commonwealth argues that appellant admitted guilt, and at trial did not display signs of suffering from any mental health problems. The Commonwealth further contends that counsel's strategic decision to argue imperfect belief of defense of others, instead of a diminished capacity defense, was reasonable.

The PCRA court rejected appellant's guilt phase, mental health-based claims of counsel ineffectiveness. The court found that appellant had not presented sufficient evidence to establish that he was so overwhelmed by the effects of cocaine that he was incapable of forming the specific intent to kill. Moreover, the court reasoned that counsel had a reasonable basis for not developing and presenting evidence related to appellant's drug use, as such evidence "could easily have prejudiced the jury against [appellant], portraying him as a drug dealer and addict who was living and conducting business

10. At trial, appellant testified that he smoked crack cocaine with Robyn Otto prior to the murders. N.T., 11/21/02, at 633.

11. Appellant's imperfect belief of defense of others theory was an amalgam of defense of others, 18 Pa.C.S. § 506(a) ("Use of force for the protection of other persons") and voluntary manslaughter, 18 Pa.C.S. § 2503(b). Section 2503(b) provides that "a person who intentionally and knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title, but his belief is unreasonable." Combining these two criminal sections, appellant's contention was that he shot Mendez and Lopez because he believed Heleva and Heleva's children were in danger. But, he acknowledged that his alleged belief was "unreasonable" and alternatively pursued a reduction in his first-degree murder charge to voluntary manslaughter.

in a known crack house." PCRA Court Opinion, 10/11/07, at 25. The court also found that counsel had a reasonable basis for asserting imperfect belief of defense of others instead of diminished capacity. The court noted that appellant did not inform counsel about his mental health problems, nor did he demonstrate outward signs of diminished capacity or mental defects. In addition, appellant's initial prison classification form recorded no signs of hallucinations, depression, suicidal tendencies, or any other mental health condition. Thus, the PCRA court determined that counsel had no reason to believe appellant suffered from mental health problems.

Regarding appellant's pre-trial prison records, the court determined that the records contained no "red flags," and suggested that appellant's reported symptoms could be attributed to his guilt. The PCRA court also opined that, "the symptoms reported by [appellant] are the type of symptoms . . . consistent with long-term confinement, especially for [someone] facing the death penalty." *Id.* at 27. Thus, the court concluded that, even if counsel had obtained these records pre-trial, they would not have given counsel cause to further investigate appellant's mental health to either support the diminished capacity defense not pursued, or to bolster the imperfect belief of defense of others theory that was pursued.

As in many capital cases, the task facing trial counsel here was daunting. The case involved the murder of two unarmed men. Each victim, moreover, suffered multiple wounds: appellant shot Lopez twice; he shot Mendez twice and then hatcheted him to death. Furthermore, the killing of Mendez involved time, coordination, and complexity: after killing Lopez, appellant and his co-defendant chased Mendez down to a neighbor's house and brought him back to finish him off, in a particularly gruesome manner. In addition, the victim's bodies were quickly moved to and hidden in Heleva's basement, and time was taken to pose their corpses in positions of humiliation. Appellant had the awareness and presence of mind to confess to the murders immediately after police arrived; although appellant did not act entirely alone, there was no question of identity. These facts made the prospect of

any successful defense against first-degree murder extremely challenging. Strategic choices made by trial counsel must be viewed in light of these limiting facts. As in all matters where counsel's ineffectiveness is being raised, this Court must be careful to assess trial counsel's performance without the distortion of hindsight, and must instead review the circumstances under which counsel's decisions were made. *Commonwealth v. Birdsong*, 611 Pa. 203, 24 A.3d 319, 333 (2011).

With the above in mind, we first address appellant's claim that counsel was ineffective for not presenting a diminished capacity defense. A diminished capacity defense "does not exculpate the defendant from criminal liability entirely, but negates the element of specific intent." *Commonwealth v. Hutchinson*, 611 Pa. 280, 25 A.3d 277, 312 (2011). Thus, if the jury accepts a diminished capacity defense, a charge of first-degree murder is mitigated to third-degree murder. To establish diminished capacity, a defendant must prove that his cognitive abilities of deliberation and premeditation were so compromised, by mental defect or voluntary intoxication, that he was unable to formulate the specific intent to kill. The mere fact of intoxication does not give rise to a diminished capacity defense. Likewise, evidence that the defendant lacked the ability to control his actions or acted impulsively is irrelevant to specific intent to kill, and thus is not admissible to support a diminished capacity defense. *Id.*

Here, the PCRA court determined that counsel was not ineffective in presenting an imperfect belief of defense of others claim; had counsel succeeded, the PCRA court reasoned, appellant would have been convicted of no more than voluntary manslaughter, which is a more positive outcome than a finding of guilt of third-degree murder via diminished capacity. This point is true enough, but it is not entirely responsive. The PCRA court's analysis fails to account for the fact that counsel did not consider the possibility of presenting a diminished capacity defense because he was not aware that there may have been relevant mental health evidence to support such a theory; if he had, a strategic choice might then have been made which would factor in, not only the

fact that a manslaughter verdict is better than a third-degree murder verdict, but also, the relative strengths of the two defenses, if both were viable. Thus, we cannot simply conclude that counsel's decision to pursue an imperfect belief of defense of others theory alone operates as a reasonable explanation for not considering and pursuing a diminished capacity defense.[12]

Instead, we find that the claim fails for different reasons. As we will address at further length in deciding the penalty phase aspect of this claim, we do not doubt that trial counsel could have uncovered some mental health evidence if he had conducted a more thorough pre-trial investigation. Nevertheless, even assuming that counsel could have discovered and developed some degree of opinion testimony along the lines of that offered by the multiple and overlapping experts hired by federal counsel, appellant has not proven that counsel was ineffective.

Although federal counsel secured experts to offer opinions on the matter to the contrary, as a practical matter, the notion that a diminished capacity defense might succeed with a jury, in the face of the circumstances of the murders here—including chasing the second victim down and bringing him back to the crime scene to finish him off, hiding and humiliating the corpses, speaking to police—relatively far-fetched. Moreover, the expert opinions below primarily focused on PTSD and hypervigilance, with the experts claiming that appellant lacked the ability to control his actions or that he acted impulsively. *See, e.g.,* Testimony of Dr. Stewart discussed *supra* (indicating that a PTSD sufferer would be more likely to react against perceived threats). It is not clear whether such mental health opinion evidence would have been admissible to support a

12. Prior case law from this Court also suggests that pursuing a self-defense theory is not necessarily exclusive of also pursuing a diminished capacity defense, in an appropriate case. In the plurality decision of *Commonwealth v. Moore*, 569 Pa. 508, 805 A.2d 1212, 1218 (2002), this Court indicated that the theories of self-defense and diminished capacity are not mutually exclusive. We reiterated this understanding in our more recent *Hutchinson* decision. Of course, the practicality of such a course is a different question than the theoretical concurrent availability of the defenses.

diminished capacity defense or, if admissible, would have been particularly strong or helpful. We have stressed the limited nature of a diminished capacity defense; at best, appellant's proffer strains the outer bounds of evidence that would be admissible to support the defense.

Second, even accepting that appellant's expert mental health evidence could tend to demonstrate more than mere lack of control or impulsivity, a diminished capacity defense would have been inconsistent with appellant's sworn trial testimony. As explained previously, in his final statement to police and at trial, appellant attempted to shift the blame for the fatal blows onto Daniel Heleva. In order to forward a successful diminished capacity defense, appellant would have had to concede his guilt to third-degree murder. Forwarding a diminished capacity defense would have been inconsistent with appellant's written statement to the police, as well as his trial testimony.

In this case, given appellant's existing accounts of his actions, the physical evidence, and the weakness of the now-proffered evidence as support for diminished capacity, we conclude that appellant has failed to prove that counsel was ineffective for not pursuing a diminished capacity defense.

■ Next, we consider appellant's claim that counsel should have presented expert testimony related to appellant's supposed cocaine-induced psychosis, PTSD and impaired judgment in support of the imperfect belief of defense of others theory that counsel actually pursued. Given the factual circumstances facing counsel, we are not under the illusion that the theory of defense chosen by counsel, however presented— i.e., as counsel presented it, or as appellant now says it should have been supplemented—was particularly strong; but those overriding circumstances were a function of appellant's conduct and the proof against him. Only those who are naive concerning the realities of criminal trials succumb to the notion that all crimes present colorable or promising defenses. Trial counsel's pursuit of an imperfect belief of defense of others claim was understandable given the facts and circumstances surrounding the crimes, and the obvious unavailability

of more plausible defenses. Weak as it may have been, counsel pursued the defense, appellant testified consistently with it, and the trial court was ultimately persuaded that jury instructions were warranted on mistaken belief voluntary manslaughter. It is well-settled that the mere fact that a strategy proved unsuccessful does not render it unreasonable. *Commonwealth v. Spotz*, 587 Pa. 1, 896 A.2d 1191, 1235 (2006).

■■■ To prevail on a justification defense, there must be evidence that the defendant "(a) . . . reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the [defendant] did not violate any duty to retreat." *Commonwealth v. Samuel*, 527 Pa. 298, 590 A.2d 1245, 1247–48 (1991); *see* 18 Pa.C.S. § 505; *see also Commonwealth v. Harris*, 550 Pa. 92, 703 A.2d 441, 449 (1997). "The Commonwealth sustains its burden [of disproving self-defense] if it proves any of the following: that the slayer was not free from fault in provoking or continuing the difficulty which resulted in the slaying; that the slayer did not reasonably believe that [he] was in imminent danger of death or great bodily harm, and that it was necessary to kill in order to save [him]self therefrom; or that the slayer violated a duty to retreat or avoid the danger." *Commonwealth v. Burns*, 490 Pa. 352, 416 A.2d 506, 507 (1980).[13]

■■ The derivative and lesser defense of imperfect belief self-defense " 'is imperfect in only one respect—an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life. All other principles of justification under 18 Pa.C.S. § 505 must [be satisfied to prove] unreasonable belief voluntary manslaughter.' " *Bra-*

13. Although the defendant has no burden to prove a claim of self-defense, before such a defense is properly in issue, "there must be some evidence, from whatever source, to justify such a finding." Once the question is properly raised, the burden is upon the Commonwealth to prove beyond a reasonable doubt that the defendant was not acting in self-defense. *Commonwealth v. Black*, 474 Pa. 47, 376 A.2d 627, 630 (1977).

*cey,* 795 A.2d at 947 (quoting *Commonwealth v. Tilley,* 528 Pa. 125, 595 A.2d 575, 582 (1991)). Thus, for example, if the defendant was not free from fault, neither self-defense nor imperfect self-defense is a viable defense.

Briefly addressing the cocaine-induced psychosis aspect of appellant's claim, we note that counsel contacted Dr. Fine at the time of trial, asking whether he could provide testimony related to the effects of cocaine. At the PCRA proceedings, Dr. Fine testified that based upon the material he reviewed at the time of trial, he did not believe that appellant would have been unable to form the specific intent to kill the victims. Thus, trial counsel in fact pursued this line of investigation at the time of trial, but ultimately found it unfruitful. There was nothing unreasonable in this decision; hence, this aspect of appellant's current ineffectiveness claim fails.

Appellant's proffer is premised upon counsel's failure to investigate and uncover mental health evidence to support appellant's imperfect belief of defense of others theory. The main thrust of appellant's current argument is that such evidence would have bolstered his position at trial that he honestly, but unreasonably, believed that deadly force was necessary to protect Heleva and Heleva's children. According to appellant, information in prison records not secured by trial counsel, if reviewed, would have led counsel to seek further information regarding appellant's mental health, and that information in turn would have led to testimony similar to that presented at the PCRA proceedings. Appellant then posits that this mental health information would have corroborated the defense theory that appellant genuinely, but unreasonably, believed that deadly force was necessary to protect others when he shot Lopez twice; then shot Mendez, chased him through the house and shot him a second time, tracked him down at a neighbor's house, brought him back, and hacked him to death; then hid the bodies after displaying them in humiliating poses.

Decisional law supports that expert testimony may be admissible to establish the defendant's subjective state of mind— whether the defendant had an "honest, bona fide belief that he

was in imminent danger"—for purposes of presenting a theory of self-defense. *See, e.g., Commonwealth v. Light,* 458 Pa. 328, 326 A.2d 288, 292 (1974). However, a defendant's subjective state of mind does not establish the objective factor of the reasonableness of his belief, *i.e.,* the belief of the need to defend oneself (or others) that he genuinely held must be reasonable in light of the facts as they appeared. *Id.*

The Superior Court explained the interplay between expert testimony and mistaken belief voluntary manslaughter in *Commonwealth v. Sheppard,* 436 Pa.Super. 584, 648 A.2d 563 (1994), *appeal denied,* 540 Pa. 598, 655 A.2d 987 (1995). In *Sheppard,* the appellant argued that trial counsel was ineffective for failing to object to the trial court's exclusion of psychiatric testimony as to his impaired mental functioning, based on paranoid ideation and his heavy use of alcohol, in order to establish, among other defenses, imperfect belief self-defense. In essence, the appellant's theory was that a diagnosis of paranoid personality in conjunction with his heavy use of alcohol made him not guilty of any charge of homicide greater than voluntary manslaughter based on the manner in which the mental defect affected his perception of the events surrounding the crime.

The panel first explained that an imperfect self-defense voluntary manslaughter theory has two components: the defendant's subjectively-held belief of danger posed by the victim, as to which expert testimony was admissible, and the objective measurement of that belief, *i.e.,* the reasonableness of that held belief, as to which expert testimony was inadmissible. *Id.* at 568, 436 Pa.Super. 584; *see also Light,* 326 A.2d at 292; *Commonwealth v. Pitts,* 740 A.2d 726, 733–34 (Pa.Super.1999) (evidence of PTSD is relevant and probative to appellee's state of mind on issue of self-defense).

The *Sheppard* Court stressed that a viable claim of imperfect self-defense voluntary manslaughter cannot be based solely on the subjective state of mind of the defendant. "It is not the appellant who determines what is a reasonable belief. There must be some standard by which it is measured." *Id.* at 569, 436 Pa.Super. 584. The *Sheppard* panel further ex-

plained that Section 2503(b) did not contemplate diagnosed mental disorders as a shield for a defendant when an imperfect self-defense theory is pursued, "but rather speaks to a misperception of the factual circumstances surrounding the event." *Id.* at 569, 436 Pa.Super. 584. The panel indicated that the appellant's theory sought to extend imperfect self-defense beyond its intended purpose and "would open the flood gates to imperfect self-defense claims based entirely on a subjective state of mind when the objective component is not present." *Id.*

Appellant's argument in this case is similar to the argument rejected by the Superior Court in *Sheppard.* Appellant appears to believe that his alleged mental defects can justify his actions in killing two people regardless of an objective assessment of the facts and circumstances surrounding the murders. Notably, current counsel entirely ignore the facts and circumstances surrounding the murders, concentrating solely on trial counsel's failure to present mental health evidence to bolster appellant's alleged "honest" belief that Heleva and Heleva's children were in danger unless he killed Lopez and Mendez.

We have no doubt that expert mental health testimony would have been admissible and relevant to the imperfect defense of others defense that the trial court determined was adequately supported by the facts so as to allow counsel to pursue the defense. However, appellant has not shown that the addition of such testimony, concerning one of the two central aspects of a claim of imperfect belief of defense of others, creates a reasonable probability that the jury would have returned verdicts of involuntary manslaughter. As we noted at the outset, this defense was not particularly strong or plausible, for reasons having to do with circumstances other than appellant's supposed mental state. Appellant shot two unarmed men, who were doing no more than throwing punches at Heleva. By appellant's own testimony, the victims were "beating up" Heleva and he "just got scared and grabbed the shotgun" and fired two shots. N.T., 11/21/2002, at 634. Furthermore, the facts also demonstrated that Heleva's children were upstairs at the time of the incident, while the initial

altercation—into which appellant introduced the firearm-was occurring downstairs. Most damning is the fact that appellant and Heleva chased down and dragged the wounded Mendez back to the house before killing him with a hatchet; any self-defense-related claim as to Mendez was clearly doomed by this fact. Certainly, at the time appellant and Heleva chased down Mendez, any belief that others were in imminent danger was objectively unreasonable. Moreover, appellant's entire course of conduct suggested that he was not free from fault in continuing, and indeed escalating, the difficulty. Under such circumstances, we conclude that appellant has not demonstrated a reasonable probability that, if only counsel would have introduced supporting expert testimony on the subjective half of his imperfect defense of others claim, the jury would have credited that his perceptions, if genuinely held, were objectively reasonable. *See Light, supra.*[14] Accordingly, appellant has failed to establish that trial counsel was ineffective for failing to proffer mental health evidence in support of his imperfect belief of defense of others claim.

14. Appellant appends an assertion to his guilt phase claim that "in assessing prejudice, this Court should draw appropriate adverse inferences from the fact that Appellant's post-conviction mental health presentation was not even rebutted by the Commonwealth who called no expert witnesses of its own." Brief of Appellant at 44–45. This argument is frivolous. Appellant cites to a workers' compensation case and WIGMORE ON EVIDENCE in support of his "adverse inference" theory rather than governing case law involving a collateral attack on a criminal conviction, premised upon a standard—*Strickland*—that establishes a presumption of counsel's competence. Moreover, the legal principles cited by appellant do not support his theory, but, instead, say only that an "adverse inference" may be appropriate when a workers' compensation claimant (the party with the burden) fails to produce evidence in support of his claims. Here, appellant is the claimant and it is his burden to prove his claims of ineffectiveness, including presenting evidence in support of his mental health claims. The Commonwealth has no such burden. The Commonwealth properly disputed appellant's hired experts' testimony through cross-examination.

Moreover, although counter-expert evidence can certainly make the Commonwealth's task on collateral attack easier—in this Court's experience, mental health expert testimony in capital PCRA matters very frequently is contradictory—the Commonwealth is not obliged to go to the expense of procuring expert opinion rebuttal merely because the FCDO apparently is so flush with financial resources that it secures multiple and overlapping experts to support its theories.

### b. Penalty Phase Mental Health Mitigation Evidence

The next argument is similar to the one advanced for purposes of guilt phase proceedings, but pertains to the investigation and presentation of mitigation evidence during the penalty phase of appellant's trial.[15] Appellant alleges that the mental health evidence he produced on collateral attack could have established the catch-all mitigator,[16] the extreme mental or emotional disturbance mitigator,[17] and the defendant's inability to conform his conduct to the law mitigator.[18]

15. As part of his argument, appellant claims that counsel fell short of the American Bar Association ("ABA") Guidelines. However, this Court has "never endorsed or adopted the ABA [G]uidelines in full." *Commonwealth v. Wright*, 599 Pa. 270, 961 A.2d 119, 132 (2008). Constitutional claims of ineffective assistance are measured by *Strickland* and its progeny; the High Court has not assigned the task to any private group. Rather, that Court has noted that the ABA Guidelines "can be useful as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place." *Bobby v. Van Hook*, 558 U.S. 4, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009)(*per curiam* ) (citing *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052). Notably, although appellant was tried in 2002, he relies almost exclusively on the 2003 ABA Guidelines in criticizing counsel. Counsel obviously cannot be expected to conform to ABA Guidelines which did not exist at the time of trial. Appellant does note that earlier versions of the ABA Guidelines exist and he cites, once, to the 1989 ABA Guidelines. However, this one citation is mere boilerplate, and does not prove that counsel deviated from the opinions and recommendations in the 1989 ABA Guidelines, much less that the 1989 ABA Guidelines reflected the prevailing professional norms in Pennsylvania at the time of appellant's trial. As presented, then, appellant's reliance on ABA standards is frivolous.

16. The catch-all mitigator permits a defendant, in the penalty phase, to introduce as a mitigating circumstance "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa.C.S. § 9711(e)(8).

Appellant separately alleges that counsel's failure to request a jury instruction on the catch-all mitigator evidences deficient performance. Brief of Appellant, at 46. Appellant inexplicably ignores that the trial court in fact instructed the jury on the catch-all mitigator. *See* N.T., 11/25/02, 898–99.

17. The jury may find as a mitigating circumstance that, at the time of the offense, "[t]he defendant was under the influence of extreme mental or emotional disturbance." 42 Pa.C.S. § 9711(e)(2).

18. The jury may find as a mitigating circumstance that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to

Appellant claims that, at the very least, counsel should have had Dr. Fine testify as a mitigation witness.

The Commonwealth fails to develop a helpful responsive argument on this issue.

In explaining its denial of the claim, the PCRA court noted that counsel provided Dr. Fine with all relevant information available to him. Dr. Fine then informed counsel that appellant's use of cocaine could not be shown to have caused cocaine delirium or cocaine-induced psychotic disorder at the time of the murders. The court found that the only records counsel failed to review were the pre-trial prison records, but counsel was not ineffective in failing to review these records as they did not contain any "red flags" indicative of mental illness. The PCRA court further found that counsel could not be faulted for not investigating appellant's background, as appellant indicated that he did not want his family to be contacted and refused to provide contact information. Further, the court determined that counsel had no reason to investigate appellant's mental health because appellant did not display any symptoms of mental illness before or during trial. Accordingly, the court determined that counsel had a reasonable basis for not conducting additional investigation into appellant's mental health status and background.

In challenging these findings, appellant relies on *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), and *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), wherein the U.S. Supreme Court generally recognized that capital counsel has an obligation to thoroughly investigate and prepare mental health and other mitigating evidence, *Williams*, 529 U.S. at 396, 120 S.Ct. 1495; counsel cannot meet this requirement by relying on "only rudimentary knowledge of [the defendant's] history from a narrow set of sources." *Wiggins*, 539 U.S. at 524, 123 S.Ct. 2527. This Court has noted:

conform his conduct to the requirements of law was substantially impaired." 42 Pa.C.S. § 9711(e)(3).

> Under prevailing constitutional norms as explicated by the United States Supreme Court, capital counsel has an obligation to pursue all reasonable avenues for developing mitigating evidence. Counsel must conduct a thorough pretrial investigation, or make reasonable decisions rendering particular investigations unnecessary. Strategic choices made following a less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitation of the investigation. In undertaking the necessary assessment, courts are to make all reasonable efforts to avoid distorting effects of hindsight. Nevertheless, courts must also avoid "*post hoc* rationalization of counsel's conduct."

*Commonwealth v. Williams,* 597 Pa. 109, 950 A.2d 294, 303–04 (2008) (citations and footnote omitted); *see also Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

The reasonableness of capital defense counsel's investigation and presentation of mitigation evidence may depend in large part on the extent to which the defendant assisted counsel's investigation and presentation. *See, e.g., Commonwealth v. Rega,* 593 Pa. 659, 933 A.2d 997, 1026 (2007) (reasonableness can depend on information supplied by defendant); *Commonwealth v. Rios,* 591 Pa. 583, 920 A.2d 790, 810–11 (2007) (counsel not ineffective for not providing testimony of defendant's family members when defendant instructed counsel not to present their testimony). In considering a claim related to counsel's alleged deficient performance in failing to investigate and present mitigating evidence, this Court considers a number of factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the additional or different mitigation evidence that could have been presented. *Commonwealth v. Collins,* 585 Pa. 45, 888 A.2d 564, 580 (2005). None of these factors is, by itself, dispositive, because even if the

investigation conducted by counsel was unreasonable, this fact alone will not result in relief if the defendant cannot demonstrate that he was prejudiced by counsel's conduct. *Id.*

Here, the PCRA court found that appellant opposed any investigation into his background. However, the PCRA court spoke too broadly. It is true that appellant told counsel that he did not wish to involve his family members, and in certain cases an effective case in mitigation may involve the testimony of family members. But, there are other ways to build a case in mitigation, and appellant's directive did not absolve counsel of the duty to gather meaningful information concerning appellant's life history, such as school records or records related to his incarceration. Nor, by its terms, did appellant's directive not to involve family members equate to a directive not to investigate and present a case in mitigation through other means. Notably, counsel possessed at least rudimentary knowledge of appellant's background via counsel's paralegal; there was nothing to prevent counsel from seeking school records to augment that knowledge. Furthermore, there were indicia from the paralegal's interview of appellant of domestic violence and child abuse during appellant's upbringing which counsel never investigated. At the PCRA hearing, counsel explained that he did not follow up on the information contained in his paralegal's report because they did not involve appellant—in counsel's words, the statement that appellant gave to the defense paralegal may have reflected abuse in appellant's childhood household, but it did "not indicate any abuse towards the client." N.T., 3/7/07, at 21. But, this position is unresponsive; absent some follow-up or further investigation counsel could not, with confidence, say whether there was helpful information to be gleaned from appellant's family background.[19]

19. The Concurring and Dissenting Opinion by Mr. Justice Eakin ("CO/DO") accepts the PCRA court's determination that appellant opposed any investigation into his background as a basis for rejecting appellant's ineffectiveness argument. As explained in the text, that conclusion does not account for other ways in which counsel can and should develop a case in mitigation, including gathering basic information, such as school records or pre-trial incarceration records.

We are also concerned that the PCRA court gave little weight to the fact that counsel did not begin preparing for the penalty phase until two weeks prior to trial. Obviously, belated preparation is not ineffectiveness by itself.[20] Nevertheless, such delay can be an indicator of deficient stewardship when there appears to be information that counsel could have uncovered if he had given himself sufficient time to diligently investigate and prepare a case in mitigation. In this matter, there was such other evidence. The record confirms that counsel consulted with no mental health expert regarding possible mitigating evidence. Indeed, counsel did not contact Dr. Fine until November 15, 2002, the same day that the Commonwealth presented its first witness at trial. The record further shows that counsel's interaction with Dr. Fine did not encompass potential mitigation evidence, but instead, was specifically limited to determining whether appellant's use of cocaine interfered with his ability to form the specific intent to kill required for capital murder. We have concluded in a similar situation that counsel's singular focus on cocaine-induced psychosis as the key to the guilt phase, coupled with a disregard for other forms of mental health mitigating evidence which would have been useful at the penalty phase, cannot be said to have been a reasonable strategy. *Commonwealth v. Smith*, 606 Pa. 127, 995 A.2d 1143, 1172 (2010).

Additionally, the record demonstrates that counsel did not obtain appellant's school records or his pre-trial prison records. Appellant's school records showed that he was a poor performer in school with a borderline intelligence. He never graduated from high school. The pre-trial prison records indicated that appellant had reported having trouble sleeping and hearing voices, and requested a psychiatric evaluation. These records would have prompted further investigation by counsel. On the record presented here, we cannot conclude

20. Like the PCRA court's opinion, the CO/DO also does not confront the belatedness of counsel's preparation. Additionally, the CO/DO notes that trial counsel consulted a mental health expert, but does not address the fact, discussed below, that Dr. Fine's task was limited to the development of guilt phase evidence and did not include any inquiry or investigation into the possibility of mitigating evidence.

that counsel conducted a reasonable investigation into possible mitigating evidence.

Further, and by comparison, counsel's penalty phase presentation was modest, consisting of presenting appellant's minor criminal record (two prior misdemeanors for possession of marijuana) and four mitigating witnesses, including appellant, who testified generally to appellant's good and caring nature, and appellant's own expressions of remorse. The sum of the defense mitigation testimony encompassed ten pages of penalty phase transcript and counsel's closing remarks were commensurately brief, given the minimal case in mitigation. Accordingly, considering the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, the additional or different mitigation evidence that could have been discovered and presented, and the Commonwealth's failure to muster any relevant argument in defense of counsel's performance, we hold that counsel's performance related to the development and presentation of mitigating evidence was constitutionally deficient.

 Our inquiry does not end here, since appellant's claim fails if he is unable to establish that counsel's deficient performance actually prejudiced him. Notably, the PCRA court did not address *Strickland* prejudice in any meaningful way— the court's two-sentence analysis is conclusory and fails to account for the specific conduct (or lack thereof) of counsel or the context of the case itself.[21] Nor does the Commonwealth address *Strickland* prejudice.

21. The PCRA court also framed its prejudice conclusion as finding that the proffered mitigation evidence was "not so overwhelmingly persuasive as to result in a different outcome." *See* PCRA court opinion, 10/11/2007, at 55. *Strickland* does not require the evidence to be "overwhelmingly persuasive" and instead, frames the inquiry as requiring the defendant to prove a "reasonable probability" that the outcome of the proceeding would have differed. In this case, as the jury found one aggravating circumstance and two mitigating circumstances, the prejudice inquiry considers "whether there is a reasonable probability that, had the PCRA evidence been adduced at the penalty phase, [appellant] would have been able to prove at least one additional mitigating circumstance, and at least one juror would have concluded that the mitigating circumstances collectively outweighed the aggrava-

*Strickland* actual prejudice requires the defendant to prove a reasonable probability that, but for counsel's lapse, the result of the penalty proceeding would have been different. Additionally, prejudice must be analyzed in the context of the case, taking into account the developed penalty phase facts. *Commonwealth v. Lesko,* 609 Pa. 128, 15 A.3d 345, 383–85 (2011) (citing, in relevant part, *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052).

This case involves the murder of two individuals nearly simultaneously. Additionally, appellant confessed to the crimes almost immediately after they were committed. We have recognized that a defendant convicted of multiple murders has a difficult task in establishing that he was prejudiced by counsel's failure to adequately investigate and present evidence in mitigation. *See Lesko,* 609 Pa. 128, 15 A.3d at 383–85 (citing, in relevant part, *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052); *see also Commonwealth v. Gibson,* 597 Pa. 402, 951 A.2d 1110, 1151 (2008) (Castille, C.J., concurring). In instances where the result concerning prejudice is not self-evident, but instead requires careful analysis of prejudice in the specific factual context of the case, we have remanded for the PCRA court to conduct the prejudice inquiry in the first instance. *Gibson, supra.* As the evidence of the experts offered at the PCRA hearing established the possibility of additional mitigating circumstances, we conclude that the better course is to have the PCRA court conduct the prejudice inquiry in the first instance, assisted by relevant advocacy from both sides. Accordingly, we will remand this claim to the PCRA court for an appropriate *Strickland* inquiry into prejudice.

## 2. *PEREMPTORY CHALLENGES*

Appellant next argues that the Commonwealth used peremptory challenges to unconstitutionally exclude female and Latino jurors. Appellant notes that the jury pool consisted of sixteen women and twenty-four men. He then observes that

ting ones." *Commonwealth v. Gibson,* 610 Pa. 332, 19 A.3d 512, 526 (2011).

nine of the thirteen jurors the prosecutor peremptorily challenged were female, while he peremptorily challenged only four of twenty-four men. Thus, appellant argues that the prosecutor struck females at a rate of three times more than he struck males. Likewise, appellant states that the prosecutor struck the only prospective juror with a Latino surname. For these reasons, he argues that he has established a *Batson*[22] *prima facie* case of discrimination. Appellant further alleges that the neutral explanations for the strikes offered by the Commonwealth, which the PCRA court credited, were "inherently susp[ect] or pretextual." Brief of Appellant, at 84. Recognizing that he waived any *Batson* claim at trial, appellant argues that counsel was ineffective for failing to raise this issue during jury selection.

The Commonwealth contends that appellant cannot establish a *prima facie Batson* violation because nothing in the jury selection transcript indicates any purposeful discrimination based on race, ethnicity, or gender.

The PCRA court noted that, as appellant had failed to raise a *Batson* objection at trial, there was no record upon which it could assess whether a *prima facie* case for a *Batson* claim was met. The judge, who also presided at trial, then reviewed the transcript and found nothing in the prosecutor's questions that indicated any racial or gender bias. Furthermore, the court found that the record reflected gender-neutral and race-neutral reasons for the prosecutor to strike each of the jurors he peremptorily challenged, and there was no indication of unconstitutional bias. As appellant's underlying *Batson* claim was meritless, the court found that counsel was not ineffective.

 Defaulted *Batson* claims argued through the derivative guise of ineffectiveness are not, indeed cannot, be

22. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *Batson* held that peremptory challenges may not be used in a racially discriminatory manner. In *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), the U.S. Supreme Court extended *Batson* to prohibit purposeful gender discrimination through the use of peremptory challenges. For ease of discussion, we will refer to claims of either racial or gender discrimination in the use of peremptory challenges as *Batson* claims.

treated the same as properly preserved *Batson* objections. *See Commonwealth v. Uderra,* 580 Pa. 492, 862 A.2d 74, 86 (2004). When there is no *Batson* objection during jury selection, "a post-conviction petitioner may not rely on a *prima facie* case under *Batson,* but must prove actual, purposeful discrimination by a preponderance of the evidence ... in addition to all other requirements essential to overcome the waiver of the underlying claim." *Id.* at 87.[23] In the absence of such a showing, the petitioner cannot meet the *Strickland* standard. Furthermore, "[a] finding by the trial court as to an absence of discriminatory intent must be given great deference on appeal." *Commonwealth v. Spotz,* 587 Pa. 1, 896 A.2d 1191, 1212 (2006) (quoting *Commonwealth v. Jones,* 542 Pa. 464, 668 A.2d 491, 518 (1995)).

It is notable that appellant does not acknowledge or even cite *Uderra* in his argument to this Court. Appellant's argument instead relies heavily upon bare statistical evidence, focusing on the Commonwealth's strikes in isolation, with no account of the effect that his own peremptory challenges had upon the jury pool. But a raw lack of racial or gender equivalency in a party's use of peremptory challenges alone does prove purposeful discrimination in jury selection, much less discrimination so overt that trial counsel was obliged to object. *See Ligons,* 971 A.2d at 1144 (racially disproportion-

**23.** This Court has also required a party asserting a *Batson* violation to provide a full and complete record demonstrating the alleged violation. *Uderra,* 862 A.2d at 84 (citing *Commonwealth v. Holloway,* 559 Pa. 258, 739 A.2d 1039, 1045 (1999)). Specifically, we have required information about the race or gender of potential jurors peremptorily challenged by the Commonwealth, the race and gender of potential jurors acceptable to the Commonwealth but peremptorily challenged by the defense, and the composition of the jury selected. *Commonwealth v. Spence,* 534 Pa. 233, 627 A.2d 1176, 1182–83 (1993). This requirement gives the reviewing court " 'account[s of] the composition of the panel as a whole, and the conduct of other lawyers exercising strikes.' " *Commonwealth v. Ligons,* 601 Pa. 103, 971 A.2d 1125, 1170 (2009) (Castille, C.J., concurring) (quoting *Commonwealth v. Hackett,* 598 Pa. 350, 956 A.2d 978, 991 (2008) (Castille, C.J., concurring)). Some members of the Court have criticized the *Spence* requirement, indicating a preference to eliminate it altogether. *See Hackett,* at 991–92 (Pa.2008) (Saylor, J., concurring). Our decision today is not based on this requirement.

ate number of peremptory challenges "in and of itself, is insufficient to demonstrate purposeful discrimination when considering the totality of the circumstances."). Moreover, the record supports the PCRA court's conclusion that there was no indication of purposeful discrimination here. Indeed, the prosecutor accepted seven females as jurors—even though he did not use seven of his peremptory challenges—three of whom appellant peremptorily challenged, and four of whom served on the jury. Further, nothing in the transcript indicates any gender-based bias or animus. In a case involving a similar *Batson/Strickland* claim premised upon raw data and hindsight, we held that there was no gender-based purposeful discrimination when the prosecutor removed nine female potential jurors, four women served on the jury, and the prosecutor accepted four women who were later struck by the defense. *Spotz*, 896 A.2d at 1212-13. Thus, the PCRA court properly concluded that appellant did not prove that the Commonwealth purposefully discriminated on the basis of gender in its use of peremptory challenges, and counsel cannot be deemed ineffective for failing to raise the speculative claim appellant now faults him for failing to pursue.

■ Appellant's claim of ineffectiveness for failing to allege racial discrimination in the use of peremptory challenges is similarly baseless. Appellant focuses on the prosecutor's peremptory challenge of a prospective juror who he claims was the sole Latino venireperson. The PCRA court determined that the potential juror's indication of a strong belief that a life sentence was worse than death provided a proper basis for the prosecutor to remove her. PCRA Court Opinion, 10/11/07, at 16 n.6. After reviewing the record, we find support for the PCRA court's determination, as the prosecutor challenged this potential juror shortly after she said she thought a life sentence was worse than death. *See* N.T. Voir Dire, 11/14/02, at 16. Further, there is no other indication in the record of racial or ethnic discrimination on the prosecutor's part. Nor does appellant point to any other objective factor that should have indicated to trial counsel that the Common-

wealth's challenge was for the nefarious reason appellant now imagines and alleges, rather than the obvious one.

Additionally, as noted, appellant inexplicably fails to acknowledge the *Uderra* "actual, purposeful discrimination" standard and instead repeatedly cites to the *Batson prima facie* case standard in support of his position—even though he is pursuing his defaulted claim via collateral attack, and under the guise of ineffective assistance of counsel. Because appellant fails to even attempt to satisfy his burden on collateral attack, his claim is frivolous: he has not overcome the deference owed to the PCRA court's finding, *Spotz supra;* and he has failed to prove that the Commonwealth actually and purposefully discriminated in its peremptory challenges. Counsel cannot be considered ineffective for failing to pursue a frivolous claim.

Appellant also claims that the PCRA court improperly denied him an evidentiary hearing on this claim. In the 35th footnote in his 99–page brief, appellant offhandedly declares that the "Court denied Appellant's request for discovery on this claim, including the Prosecutor's notes regarding jury selection, which precluded Appellant from having a full and fair hearing on this claim." *See* Brief of Appellant at 84, n.35.

The PCRA court considered the claim and reasoned that appellant did not show good cause for discovery of jury selection information. *See* PCRA Court Opinion, 4/30/07, at 6–7. Appellant does not develop his discovery argument; it is waived both because it is not comprised within his statement of questions presented, and because its lack of development makes it frivolous.

For purposes of post-conviction proceedings an evidentiary hearing is not required when "there are no genuine issues concerning any material fact...." Pa.R.Crim.P. 909(B)(2). Furthermore, the decision whether to grant an evidentiary hearing is within the discretion of the PCRA court and will not be overturned absent an abuse of that discretion. *Commonwealth v. Harris,* 578 Pa. 377, 852 A.2d 1168, 1180 (2004). As explained above, appellant's *Batson* proffer is frivolous and

unresponsive to the governing collateral review standard. Accordingly, appellant cannot demonstrate that the PCRA court abused its discretion by denying him an evidentiary hearing on his claim that counsel was ineffective for failing to raise a *Batson* claim.

### 3. *WITHERSPOON–RELATED CLAIMS*

 Appellant next contends that the trial court violated *Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (juror in capital case may not be excluded merely because of general moral, personal, or religious reservation regarding death penalty) by removing, for cause, four potential jurors because they expressed doubts about imposing the death penalty. Appellant argues that counsel was ineffective in failing to object to the removal of these potential jurors and for failing to demonstrate that they were suitable jurors.[24]

The PCRA court found appellant's claim of ineffective assistance of counsel unreviewable because it was a mere boilerplate assertion. Alternatively, the court determined that there were legitimate reasons to excuse the four potential jurors.[25]

 The decision to disqualify a juror is within the trial court's discretion, and, where an objection is made and pursued on appeal, the decision will only be reversed for an abuse of that discretion. *Commonwealth v. Steele*, 599 Pa. 341, 961

24. In response to appellant's *Witherspoon* claim, the Commonwealth argues that appellant's claim "that Monroe County's jury selection process systematically under-represents minorities" fails because appellant's boilerplate claims of ineffectiveness are insufficient. Brief of the Commonwealth, at 14. The Commonwealth has apparently confused this claim with a claim appellant pursued in the PCRA court but has now abandoned by not raising it on appeal.

25. At the conclusion of jury selection, appellant indicated that he was consulting with and instructing counsel during jury selection. The PCRA court, in an apparent alternative holding, determined that appellant waived any challenge to counsel's performance during jury selection because of his active participation. Appellant baldly asserts that the PCRA court erred because his participation did not relieve counsel of his obligation to perform effectively in jury selection. Given our disposition below, we will not address this ground for decision.

A.2d 786, 804 (2008) (citing *Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220, 262 (2006)). This Court has noted that, "a trial court is within its discretion to exclude jurors who expressed reservations about imposing the death penalty, and ... trial counsel has no constitutional obligation to attempt to change the jurors' views." *Id.* However, a potential juror in a capital trial may not be excluded merely because of a general moral, personal, or religious reservation about the death penalty. *Id.* at 803 (citing *Witherspoon*, 391 U.S. at 522, 88 S.Ct. 1770).

Here, the record supports the PCRA court's determination that two of the four jurors in question were properly removed because they indicated that they would not be able to impose the death penalty. *See* N.T. Voir Dire, 11/12/02, at 80 ("I just don't think I could [vote for the death penalty]."); N.T. Voir Dire, 11/13/02, at 137 (potential juror indicated that his feelings would "more or less" affect his "ability to evaluate the evidence"). The third potential juror, who expressed doubts about the death penalty, was excused because she lacked sufficient transportation to attend trial. N.T. Voir Dire, 11/12/02, at 180. The final potential juror, who had reservations about the death penalty, was excused after it became apparent that she was having extensive difficulty in understanding legal concepts. *See* N.T. Voir Dire, 11/13/02, at 67 (potential juror expressed fear "I would not understand and I [would] do the wrong thing").

On this record, appellant's hindsight speculations do not prove that counsel was constitutionally obliged to try to convince these jurors to alter their stated views. *Carson, supra.* Some lawyers and organizations may encourage or pursue strategies to make capital case jury selection a tedious, weeks-long process; indeed, since a single juror can negate the death penalty, there no doubt is an incentive to try to seat jurors who may have difficulty following their oaths. But, nothing in the Sixth Amendment requires this sort of practice. Appellant has not established that any of the four excused jurors were improperly excluded as a matter of law because of a general moral, personal, or religious reservation about the

death penalty, such that counsel was constitutionally required to object or attempt to "rehabilitate" the jurors. The record supports the PCRA court's determination that the jurors were removed for cause because they expressed reservations about their ability to impose the death penalty or for reasons unrelated to their views on the death penalty. Accordingly, this claim is meritless, and counsel was not ineffective for failing to object to the exclusion of these jurors.

### 4. APPELLANT'S INCULPATORY STATEMENTS

Appellant next challenges counsel's stewardship as it related to the admission of his inculpatory statements. In brief, the circumstances surrounding appellant's confessions were as follows. A neighbor noticed the commotion from the murders, reported it to authorities as a domestic violence incident, and the state police responded. A trooper handcuffed appellant and placed him in the back of a patrol car, and, still believing that he was investigating a domestic violence incident, asked appellant where the women were. Appellant replied, "There is no 'she.' They are in the basement. I shot them." N.T. Trial, 11/15/02, at 80. Appellant was then transported to state police barracks, where a state trooper read him Miranda[26] warnings; appellant then gave two inculpatory statements, the latter recorded, admitting to shooting both victims. After a 70–minute break, appellant asked to speak with the trooper and recounted a different version of the murders. He still admitted to shooting both victims, but also placed blame on Daniel Heleva for the killings.

Appellant now argues that counsel was ineffective in the manner in which he challenged the admission of his confessions in a pre-trial suppression motion. He claims that the two-hour delay before he was transported to the state police barracks, and his being kept for approximately eight hours in cold and inhospitable conditions, was coercive, and that counsel was ineffective for not developing evidence of this police coercion to support suppression. Separately, appellant repris-

26. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

es his claim that counsel was ineffective for not investigating appellant's mental health status, including evidence of his cocaine use, in support of the suppression motion, claiming his diminished mental capacity impaired his ability to voluntarily waive his *Miranda* rights and rendered him susceptible to police coercion.

The Commonwealth notes that appellant challenged the admissibility of his pretrial statements on direct appeal. The Commonwealth claims that appellant's incarceration records show he was not under the influence of, or withdrawing from, any drugs when he was initially incarcerated; thus, he cannot show that he was under the influence when he confessed.

The PCRA court concluded that this claim was previously litigated because, on direct appeal, counsel unsuccessfully challenged the admissibility of appellant's inculpatory statements. Alternatively, the PCRA court found that the claim was meritless because appellant's incarceration records indicated that he was not under the influence of, or withdrawing from, any drug, nor was there any indication that appellant suffered from any mental health problem during police questioning. Furthermore, the state police afforded appellant bathroom breaks and coffee, and moved him to an office where they removed his handcuffs. Under the circumstances, the court found, appellant did not prove that his statements were involuntary.

Although counsel moved to suppress these inculpatory statements, and raised the denial of the suppression motion on direct appeal,[27] appellant now claims that counsel was ineffective in the manner in which he litigated the suppression issue. This Court has recognized that a Sixth Amendment claim of ineffectiveness raises a distinct ground for relief and thus this manner of presenting new theories on collateral attack is not

27. On direct appeal, appellant argued that the statement he made in the patrol car should have been suppressed because it occurred prior to *Miranda* warnings and while he was in custody. Appellant also argued that the written statement was obtained while he was in custody for more than six hours in violation of *Commonwealth v. Davenport,* 471 Pa. 278, 370 A.2d 301 (1977), overruled by *Commonwealth v. Perez,* 577 Pa. 360, 845 A.2d 779 (2004).

*per se* precluded by the PCRA's previous litigation restriction. *See Collins*, 888 A.2d at 571 (ineffectiveness claims distinct from claims raised on direct appeal). Accordingly, the PCRA court erred to the extent that it concluded that appellant's ineffectiveness claim necessarily was previously litigated. Nevertheless, our review of the record shows that appellant's "new" claim, sounding in counsel ineffectiveness, is meritless.

Appellant is arguing that his explicit and informed *Miranda* waiver was not voluntary because the conditions of his custody and his mental status rendered the waiver coercive as a matter of law. Appellant also appears to assert that his waiver was not knowing and intelligent because his mental status or diminished capacity interfered with his ability to have a full understanding of the nature of the right being abandoned and the consequence of the choice. *See Commonwealth v. Mitchell*, 588 Pa. 19, 902 A.2d 430, 451 (2006) (explaining two-prong analysis for purposes of *Miranda*).

In Pennsylvania, there is no *per se* rule that there can be no voluntary waiver when a person is mentally ill. *Commonwealth v. Logan*, 519 Pa. 607, 549 A.2d 531, 537 (1988); *Commonwealth v. Bracey*, 501 Pa. 356, 461 A.2d 775, 782 (1983). Nor does appellant cite any federal authority for the proposition. Similarly, appellant cites to no governing cases, in existence at the time of appellant's trial, approving or suggesting that mental health issues, not made apparent to police conducting an interrogation, can vitiate a *Miranda* waiver. Instead, appellant's sole citation in support of his argument is a University of Chicago Law Review article published in 2002. *See* Brief of Appellant at 79.

Under *Miranda*, probative evidence, such as a confession, may be suppressed to "punish" and "deter" police misconduct, and thereby enforce constitutional protections. Thus, in the suppression realm, the focus is upon police conduct and whether a knowing, intelligent, and voluntary waiver was effected based on a totality of the circumstances, which may include consideration of a defendant's mental age and condition, low IQ, limited education, and general condi-

tion. *Commonwealth v. Cox,* 546 Pa. 515, 686 A.2d 1279, 1287 (1996). When a defendant alleges that his waiver or confession was involuntary, the question "is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess." *Commonwealth v. Templin,* 568 Pa. 306, 795 A.2d 959, 966 (2002) (*quoting Commonwealth v. Nester,* 551 Pa. 157, 709 A.2d 879, 882 (1998)).

The PCRA court found that there was no evidence of police coercion. This finding is supported by the record, as well as this Court's determination on direct appeal. *See Sepulveda,* 855 A.2d at 793. Appellant initiated the conversation in which he made his final confession. Further, the state police provided appellant with a blanket and coffee when he asked for them. Under these facts, appellant fails to show that the police interrogation was so manipulative or coercive as to deprive him of his ability to make a free and unconstrained decision to confess. Thus, counsel cannot be faulted for failing to pursue this theory in support of suppression.

We also discern no error in the PCRA court's finding that there was no obvious objective indication to counsel, state police, or the trial court that appellant suffered from any mental illness at the time he confessed his crimes, such that the police conduct can be viewed as unconstitutional manipulation warranting suppression. As in *Mitchell* and *Logan,* the facts surrounding the confession do not suggest that appellant's alleged mental status interfered with the important, but simple (all he needs say is "no") choice of whether to waive his constitutional rights. Furthermore, Dr. Puente testified that there was nothing to suggest that the crime was a result of cocaine-induced psychosis and the confessions took place immediately following the crimes. Thus, counsel had no reason to believe that appellant suffered from a mental defect at the time of his confession that was or should have been obvious to police, nor, for that matter, does the evidence suggest that appellant's alleged mental health issues interfered with his

waiver. Accordingly, appellant is not entitled to relief on this claim.

### 5. "FALSE" EVIDENCE INTRODUCED BY COMMONWEALTH

■■■ Appellant next declares that the Commonwealth introduced "false" evidence, and that counsel was ineffective for failing to discover and object to this "misconduct." The claim is frivolous.

The background for the claim is as follows. A recording of appellant's third confession was played for the jury. In the recording, appellant said that he did not notice blood on his pants until he finished disposing of victim Mendez's body. The state police transcript of the confession indicated that appellant said he did not notice blood on his pants until "I finished playin' him." N.T. Trial, 11/21/02, at 281. Trial counsel presented evidence that appellant in fact said, "I finished pulling him." *Id.*, at 707. Appellant now claims that a forensic audio examiner hired by the FCDO has examined the recording, and in his opinion, appellant actually said "I finished fighting with him." Brief of Appellant, at 72.

Appellant argues that evidence that he in fact told the police he was fighting with one of the victims would have bolstered his imperfect belief of defense of others claim. Noting the general proposition that a conviction cannot be based upon false evidence,[28] appellant rather recklessly accuses the Commonwealth of prosecutorial misconduct by allegedly withholding that he actually said "fighting." With no factual basis for the accusation, appellant further alleges that the trooper who interrogated him knew and remembered that he actually said "fighting," but nefariously declined to correct the transcript. Appellant then contends that the Commonwealth knowingly used this purported false evidence to argue that he mistreated the victims' bodies. Alternatively, appellant alleges that counsel was ineffective in failing to secure a forensic analysis of the

28. *See Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

recording, which would have revealed what appellant actually said.

The Commonwealth reviews the post-trial procedural history and contends that the record does not support appellant's claim. The PCRA court found that appellant's prosecutorial misconduct claim was waived because he failed to raise it at trial or on direct appeal. Further, the PCRA court found that the trooper could not recall what appellant actually said, but reviewed the transcript, correcting it only when it was inconsistent with the recording and his notes. Thus, the trooper never understood appellant to have used the word "fighting." The PCRA court found that appellant's claim of ineffective assistance of counsel was meritless, further noting that, because counsel offered an alternative interpretation of the recording, the jury was well aware that the content of the transcript was in question. The court also noted that the jury heard the recording for itself. Thus, the PCRA court determined that counsel was not ineffective for not seeking a third, "forensic," interpretation of the recording.

We agree with the PCRA court that appellant's claim is not cognizable to the extent it sounds in a claim of prosecutorial misconduct. The recording and transcription were made available to appellant, and he could have raised any appropriate objection. Notably, appellant, like the trooper, was at the interrogation, and he was optimally positioned to determine whether the transcription accurately reflected what he said then compared to what he heard on the tape. Indeed, it is safe to assume that appellant can better decipher his own speech than any expert, particularly since he has the benefit of his memory of the interrogation. The fact that appellant, with the help of an expert, now has a new interpretation of what he said on the audio recording that was disclosed to him does not prove that the Commonwealth committed "misconduct," and FCDO counsel should be mindful of their own ethical duties before leveling such baseless accusations.

 To the extent that appellant appends an allegation of ineffectiveness to this waived claim, the record supports the

PCRA court's determination that there was simply no indication that the Commonwealth presented "false" evidence, much less that it did so intentionally. Appellant's expert's opinion does not establish what appellant said as a mathematical certainty, or even as a fact; and even if it did, that opinion does not prove that the Commonwealth deliberately falsified the transcript or knowingly introduced false evidence. *See Commonwealth v. Henry,* 550 Pa. 346, 706 A.2d 313, 321 (1997) ("Simply because Henry's experts disagree with the Commonwealth's experts does not mean that the Commonwealth knowingly presented false evidence in violation of Henry's due process rights."). Again, the audio tape itself was made available to the defense; and appellant, who made the statement recorded on the tape, could have argued that the transcript was inaccurate. Indeed, trial counsel argued so, with appellant sitting at his side to assist. Thus, counsel called his secretary, who stated that she believed that the disputed word was "pulling," thereby apprising the jury that the Commonwealth's transcription was in doubt. Moreover, on cross-examination, counsel specifically asked the state trooper whether the written transcript accurately reflected what was on the tape. In response, the trooper indicated that "whatever I heard on the tape is what is in this transcript." N.T., 11/19/02, at 305. Appellant, and his counsel, were no worse positioned than the trooper to assess and argue the accuracy of the transcription.

Appellant also avers that counsel was ineffective because he was required to secure a forensic analysis of the recording for purposes of trial, in order to discover that appellant said something different than what he himself, apparently, thought he had said. There is nothing in *Strickland* jurisprudence that requires counsel to go to such lengths. Again, the recording itself was played for the jury and the jury had the firsthand opportunity to determine what appellant actually said or whether the word in question was clear enough on the tape to raise some doubt regarding the transcription. The jury would not have been obliged to believe an expert, rather than their own hearing. Appellant's current proffer merely

offers a third interpretation of the word in question; it is the essence of hindsight, and based upon the opinion of a particular proffered expert. Finally, there is no reasonable probability that uncertainty related to this single word could outweigh appellant's three other confessions and the forensic evidence against him and produce a different verdict.

## 6. VICTIM IMPACT EVIDENCE

Appellant next argues that counsel was ineffective for failing to object to victim impact evidence that he says was improperly introduced at trial. Appellant claims that, during the guilt phase, victim Mendez's sister improperly testified that Mendez possessed a guardian angel keychain and gold cross. Further, appellant claims that the victims' families carried photographs of the victims into court which, he says, amounted to introducing improper extra-record victim impact evidence into the guilt and penalty phases.[29]

In response, the Commonwealth summarizes the procedural history of appellant's direct appeal, which is not helpful to deciding this issue. The PCRA court concluded that Mendez's sister's testimony was not introduced or used as victim impact evidence, but was relevant to establish Mendez's identity as one of the victims. The PCRA court further determined that there was no indication that the victims' families displayed the victims' photographs at trial. In fact, the PCRA court noted that it "clearly recall[ed] that no such extra-record victim impact evidence was present in the courtroom during either phase of [appellant's] trial and such evidence would not have been permitted. Had a family member attempted to bring

**29.** Appellant also argues that the Commonwealth introduced improper victim impact evidence during the penalty phase because Mendez's sister's guilt phase testimony was incorporated into that proceeding. He then baldly states, "[o]ther improper impact evidence was also introduced." His development of this statement is limited to an assertion that the testimony of the sentencing phase witnesses "went beyond the constitutionally acceptable 'quick glimpse'" in violation of his federal constitutional rights. Appellant nowhere directs this Court's attention to specific penalty phase testimony or even cites to the transcript that allegedly reveals this violation of the U.S. Constitution. This sub-claim is waived and frivolous.

such evidence into the courtroom, it would have immediately been removed." PCRA court opinion, 10/11/2007, at 49.

Our independent review of the record corroborates that Mendez's keychain and gold cross were admitted, and properly so, to identify Mendez as a victim.[30] The record shows that the Commonwealth had Mendez's sister identify the items Mendez was wearing on the night appellant murdered him. *See* N.T. Trial, 11/15/02, at 55–58 (identifying multiple articles of clothing). State police found these items strewn across the murder scene. *See id.,* at 72–74. This evidence was relevant and admissible to show Mendez was one of the victims. Moreover, appellant does not argue or suggest that the evidence, introduced for this purpose, was actually argued as victim impact evidence. Because this evidence was properly admitted to establish identity, appellant's underlying claim lacks a factual predicate, and his derivative claim of counsel ineffectiveness necessarily is frivolous.

Appellant further argues that the victims' families displayed photographs of the victims in court, constituting extra-record victim impact evidence. Appellant's sole evidence in support of this claim is a citation to, and purported quotation from, a newspaper article. This hearsay is simply insufficient to meet appellant's burden of proof to show that the photographs were ever brought into court—especially given the trial court's specific rejection of the accuracy of this claim. Moreover, appellant's bald claim does not establish that any such photographs were displayed to the jury in a fashion that conveyed that the photographs were of the victims, much less that they were prejudicial. And, of course, even if appellant's claim had

**30.** Appellant alleges that this identification testimony was unnecessary because it was undisputed that Mendez was a victim. However, generally, "a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." *Old Chief v. United States,* 519 U.S. 172, 186–87, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). Victims are not mere props in homicide trials, and the government is permitted to prove their lives in being and individuality. *See Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385, 415 (2003) ("[M]urder victims are not simply props or irrelevancies in a murder prosecution, and innocuous references to victims and their families are not necessarily prejudicial.").

a valid factual predicate, his claim that this amounted to "evidence" is mistaken. Because appellant's improper victim impact evidence claim is baseless, counsel cannot be deemed ineffective.

## 7. JURY INSTRUCTIONS

Appellant next claims that trial counsel was ineffective for not objecting to three purported errors in the trial court's guilt phase jury instructions. First, appellant asserts that the trial court erroneously stated that imperfect belief of defense of others required an "unmistaken belief" that deadly force was necessary, and counsel was obliged to object. Appellant argues that the instruction confused the jury, preventing it from properly deciding his imperfect belief of defense of others claim. Next, appellant alleges that counsel was required to object after the trial court failed to properly instruct the jury that the Commonwealth must disprove, beyond a reasonable doubt, appellant's imperfect belief of defense of others claim, if it is to prove malice, and thus murder. Finally, appellant claims that counsel should have objected after the trial court's accomplice liability instructions supposedly failed to inform the jury that it had to conclude that appellant specifically intended to kill before it could convict him of first-degree murder.

The Commonwealth responds that the trial court has broad discretion in phrasing its instructions, and argues that the jury instructions, when read in their entirety, clearly, adequately, and accurately instructed the jury on the law.

The PCRA court likewise noted that jury instructions must be reviewed as a whole. Respecting the imperfect belief of defense of others instruction, the court found that appellant's attack on counsel focused on limited excerpts from the instructions, but when taken as a whole, "the jury charge on voluntary manslaughter clearly, adequately and accurately reflects the law on 'imperfect self-defense' (a defendant's unreasonable belief that the killings were justified)." PCRA Court Opinion, 10/11/07, at 30. Regarding malice, the court found that the

jury instructions as a whole informed the jury that it had to find malice to convict appellant of murder. The PCRA court noted that the instruction used multiple examples which made it clear that the jury could only find malice if it was convinced beyond a reasonable doubt that appellant was not acting in defense of others. Finally, the PCRA court found that the accomplice liability instruction was proper, noting that it conformed to the Pennsylvania Suggested Standard Criminal Jury Instructions. The PCRA court further determined that appellant's ineffectiveness claims were mere boilerplate assertions, and thus were insufficient to carry appellant's burden to actually prove that he was denied effective assistance of counsel.

At the PCRA hearing, counsel testified regarding the imperfect belief of defense of others charge and the malice instructions, offering that he could not recall whether he had any reason for failing to object. He was not asked about the accomplice liability charge. *See* N.T., 3/7/07, at 40–45.

 In considering the points underlying appellant's attack on counsel, we keep in mind that, when reviewing jury instructions for error, the charge must be read as a whole to determine whether it was fair or prejudicial. "The trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Commonwealth v. Washington*, 592 Pa. 698, 927 A.2d 586, 603 (2007).

### a. Imperfect Belief of Defense of Others

 As discussed previously, counsel requested that the jury be charged on voluntary manslaughter (imperfect belief) and justification (defense of others) and the trial court granted the request. Appellant accurately notes that the transcript indicates that the trial court mistakenly used the phrase "involuntary manslaughter" and "unmistaken" in a portion of its charge on imperfect belief of defense of others, as follows:

> I've been asked to charge on **involuntary** manslaughter. As I said to you previously when I defined malice, there can be no malice when certain reducing circumstances are present, a killing may be voluntary manslaughter but not murder. And this is true when the Defendant kills in the heat of passion or following a serious provocation. Or kills under the **unmistaken** belief in justifying circumstances.

N.T., 11/22/02, at 795 (emphases added). However, the reference to "involuntary manslaughter" was clarified almost immediately thereafter when the court correctly referred to the offense as voluntary manslaughter. Moreover, earlier in its charge, the court was clear that there were six possible verdicts, not guilty or guilty of first-degree murder, third-degree murder, or voluntary manslaughter. The court also stated, at that point, that it would be instructing the jury on voluntary manslaughter later in the charge. *See id.* at 789, 791. The court followed through on this promise when it instructed the jury on justification, explaining that justification would be a defense "if a Defendant reasonably believed his actions were necessary to avoid harm to someone else ... in this case the fistfight which occurred in the kitchen area involving Mr. Lopez and Mr. Mendez and Mr. Heleva." *Id.* at 800.

Related to the "unmistaken" belief reference, appellant acknowledges that the next instruction informed the jury that an "unreasonable" belief could support a finding of voluntary manslaughter as follows:

> You can find malice and murder only if you are satisfied beyond a reasonable doubt that the Defendant was not acting under sudden or intense passion, from serious provocation by the victims **or was under the unreasonable belief** that the circumstances were such that if they existed would have justified [sic] killing.

*Id.* at 795 (emphasis added). Nevertheless, appellant contends that the jury was never informed that this circumstance would warrant a verdict of voluntary manslaughter—"[i]t simply told the jury that if such an unrealistic belief existed, the jury could not find malice and murder." Appellant then

declares that, "Contrasted with the earlier and erroneous instruction, the jury would have believed such a finding would result in either conviction of murder or acquittal." Brief of Appellant at 55. Appellant also asserts that the court never defined "unreasonable belief" and further offers that the later instruction on justification compounded this absence by its repeated reference (correctly) to "reasonable belief."

There is no doubt that counsel could have objected to the court's isolated misstatements; but the question is whether he was obliged to do so, and if so, whether the failure to object led to actual prejudice. The jury charge was delivered orally, not by written transmission to be pored over by scholars; it was delivered to ordinary citizens, not to lawyers aware of other forms of manslaughter not at issue; and counsel was there to hear the charge as a whole. We are satisfied that the charge, considered as a whole, accurately conveyed the law. Contrary to appellant's assertions, the jury was informed that this portion of the instruction related to voluntary manslaughter as it followed immediately after the introductory paragraph. Indeed, the next four paragraphs, in substance, clearly related to the charge of voluntary manslaughter. Furthermore, the follow-up instruction correctly stated the elements of the offense. An isolated misstatement does not necessarily taint the charge, so long as the charge as a whole correctly informed the jury of the law. Moreover, appellant does not suggest that his defense was argued to the jury, in counsel's closing, other than according to the governing law on imperfect belief of defense of others. In this case, the charge, taken as a whole, and considered on the context of the trial as a whole, appropriately instructed the jury on imperfect belief of defense of others and appellant has not established that counsel was obliged to object and that the failure to do so caused the first-degree murder verdict.

### b. *Malice and Defense of Others*

Appellant next argues that the trial court failed to inform the jury that a finding of justification (defense of others) negates the element of malice. According to appel-

lant, the prosecution must exclude justification beyond a reasonable doubt, and the jury must be fully aware that the finding of malice requires the exclusion of the defense of justification. *See* Brief of Appellant at 59–60 (citing *Commonwealth v. Heatherington,* 477 Pa. 562, 385 A.2d 338 (1978)).

In *Heatherington,* this Court concluded that, to properly inform a jury of the relationship between malice and self-defense, a trial court must instruct as to three points:

> (1) That in order to prove murder, the prosecution must prove beyond a reasonable doubt that the killing was malicious; (2) That evidence of self-defense, from whatever source, tends to negate the malice required for murder; (3) That in order to meet its burden of proof on the element of malice, the prosecution must exclude self-defense beyond a reasonable doubt.

*Id.* at 341. This Court further noted that a trial court is free to use its own language, but must accurately explain the relationship so that the jury understands that the finding of malice requires the exclusion of the defense of self-defense. *Id.*

In this case, the defense forwarded by appellant was not (imperfect) self-defense, but defense of others. Nevertheless, the trial court instructed the jury consistently with *Heatherington.* First, the court repeatedly informed the jury that malice must be proven by the Commonwealth beyond a reasonable doubt in order to return a murder verdict. *See* N.T., 11/22/02, at 791–92, 793. When instructing the jury regarding defense of others, the court first stated that justification is a defense to the charge. The court then made clear that the Commonwealth had the burden to disprove the defense of justification beyond a reasonable doubt: "You may find the Defendant guilty only if you are satisfied beyond a reasonable doubt that his conduct was not justified under the principle set forth for you." *Id.* at 800. The court then reiterated this idea at the end of its charge on defense of others when it said, "Because the Commonwealth has the burden to disprove the defense of justification, you may find the Defendant guilty only if you are satisfied beyond a reasonable doubt that he did

not reasonably believe that the use of deadly force was necessary to protect [the accomplice] against death or serious injury to be inflicted by [sic] him on [sic] [the victims]." *Id.* at 802.

While the trial court never specifically identified malice as the element that defense of others would negate, we have concluded under analogous circumstances that the defendant cannot establish a claim of ineffectiveness so long as the trial court clearly instructed the jury that it could not find the defendant guilty of murder unless the Commonwealth met its burden to prove beyond a reasonable doubt that appellant's actions were not in self-defense. *See Commonwealth v. Natividad,* 595 Pa. 188, 938 A.2d 310, 328 (2007) ("It is true that these instructions did not specifically identify malice as that element which self-defense would specifically negate. Nonetheless, it defies logic that Appellant could have incurred prejudice when the trial court instructed that the Commonwealth must disprove Appellant's claim of self-defense beyond a reasonable doubt, and further that self-defense is a complete defense to the overall charge of murder.") In this case, the trial court's instructions adequately conveyed this concept to the jury and counsel cannot be deemed ineffective for failing to object.

### c. Accomplice Liability

Appellant next claims that the trial court erred in instructing the jury regarding accomplice liability. Appellant contends that the accomplice liability instruction relieved the Commonwealth of its burden to establish that he possessed the specific intent to kill beyond a reasonable doubt in order to be convicted of first-degree murder. However, appellant never asked counsel why he did not object to the trial court's accomplice liability instruction during the PCRA hearings; thus, appellant deprived counsel of an opportunity to explain his conduct. This Court has held that bald assertions and boilerplate allegations of the lack of a reasonable basis for trial decisions cannot satisfy the appellant's burden to establish ineffectiveness. *See Commonwealth v. Puksar,* 597 Pa. 240,

951 A.2d 267, 293–94 (2008). In his brief on appeal, appellant offers two sentences, simply declaring that counsel had no reasonable basis for not objecting to the jury instruction.[31] When this scant argument is coupled with the failure to inquire into counsel's strategy at the PCRA hearing, we conclude that appellant's ineffectiveness claim relating to the accomplice liability instruction fails as appellant has not established that counsel's performance was deficient. *See id.* at 278.

Furthermore, even assuming that appellant sufficiently developed his ineffectiveness claim, this claim fails because appellant cannot establish that he was prejudiced by trial counsel's inaction. This Court has made clear that where the only object of the conspiracy is a conspiracy to kill, an appellant cannot establish that he was prejudiced by a jury instruction that was erroneous under *Commonwealth v. Huffman*, 536 Pa. 196, 638 A.2d 961 (1994). *Commonwealth v. Wayne*, 553 Pa. 614, 720 A.2d 456 (1998).

*Wayne* involved a collateral attack on a sentence of death and a claim of ineffectiveness of trial counsel for failing to object to the jury instructions under *Huffman*. The objected-to instruction related to co-conspirator liability for first degree murder. We found arguable merit to the petitioner's claim, but concluded that the petitioner could not establish that he was prejudiced by counsel's inaction. We explained the harm

31. Appellant also baldly declares "all prior counsel's ineffectiveness" with regard to his jury instruction claims. Current counsel asserts that "[w]here as here, counsel fails to raise or litigate an obvious record-based error, both deficient performance and prejudice—and therefore constitutional ineffectiveness of counsel—are established." Brief of Appellant, at 65 (citing *Claudio v. Scully*, 982 F.2d 798, 799 (2d Cir.1992)).

Appellant apparently believes that where the defendant feels he has identified an obvious record-based error, he is absolved of his burden to actually prove that counsel acted unreasonably and that actual prejudice resulted. This is not the law. Indeed, in a series of decisions counsel neglects to acknowledge, this Court has repeatedly rejected such an approach to the ineffectiveness inquiry. *Commonwealth v. Colavita*, 606 Pa. 1, 993 A.2d 874, 895–96 (2010). In any event, as we have discussed each of the jury instruction claims individually and found current counsel's complaints wanting, this misapprehension of governing law merits no further attention.

that *Huffman* sought to cure—whether the jury verdict as to the conspirators was reached through speculation as to the nature of the conspiracy and the role of the conspirators—was not present where the only object of the conspiracy was one to kill. "Once this jury determined that appellant was guilty of conspiracy, given the sole object of the conspiracy, the only logical conclusion to reach is that this jury also determined, beyond a reasonable doubt, that appellant possessed the specific intent to kill." *Id.* at 465; *see also Bronshtein v. Horn,* 404 F.3d 700, 713–14 (3d Cir.2005) (finding error in jury instruction harmless where jury was informed that in order to find defendant guilty of conspiracy to commit murder, it had to find that he did so with intent of promoting or facilitating crime of murder).

In this case, the trial court instructed the jury regarding the specific intent to kill, which is necessary for a first-degree murder conviction. N.T., 11/22/02, at 791–92. The trial court also instructed the jury that the sole object of the conspiracy was to "cause the death" of Mendez. *Id.* at 799. The trial court further instructed the jury that it could only find appellant guilty of conspiracy if he did so with the intent to promote or facilitate the commission of the crime of homicide or killing of Mendez. Like the jury in *Wayne,* the jury here convicted appellant of conspiracy. And, given the sole object of the conspiracy, the only logical conclusion is that the jury also determined that appellant possessed the specific intent to kill Mendez. Furthermore, even though the objected-to instruction here related to accomplice liability, and not co-conspirator liability, that difference does not command a different prejudice analysis from the one performed in *Wayne,* since the harm that *Huffman* sought to avoid, a first-degree murder conviction premised upon speculation respecting specific intent, is not present because of the jury's conclusion that appellant was guilty of conspiracy to kill and the necessary determination that he did so with the intent to promote or facilitate that murder.[32]

32. The conspiracy charge did not extend to the Lopez murder, presumably because appellant admitted to shooting Lopez although he disput-

## 8. *CONFLICT OF INTEREST*

Appellant next claims that his trial counsel was ineffective in failing to disclose to appellant that he had a conflict of interest. The facts relating to the claim are as follows. The trial prosecutor was the District Attorney of Monroe County, Mark Pazuhanich, Esquire. In early November of 2003, after the direct appeal briefs were filed, and soon before this Court heard oral argument in appellant's direct appeal, Pazuhanich was elected to the Court of Common Pleas of Monroe County. On November 29, 2003, five days before the direct appeal was argued in this Court, Judge-elect Pazuhanich was arrested in Luzerne County on charges unrelated to his duties as a prosecutor involving the indecent assault of a child. On July 12, 2004, Pazuhanich pleaded *nolo contendere* in the Luzerne County Court of Common Pleas to two counts of indecent assault, one count of endangering the welfare of children, one count of corruption of minors, and the summary offense of public drunkenness. The court sentenced him to ten years' probation and directed him to comply with and register pursuant to Megan's Law II (42 Pa.C.S. § 9791 *et seq.*).

In the interim, Pazuhanich was sworn in by a notary public as Judge of the Court of Common Pleas of Monroe County on January 5, 2004; however, he was placed on administrative suspension shortly thereafter, and was later removed from the common pleas bench by the Court of Judicial Discipline on October 1, 2004.

Appellant's trial counsel represented Pazuhanich at his initial arraignment, was then replaced by other counsel, but then returned to represent Pazuhanich in the guilty plea process, as

ed that he fired the fatal shot. Instead, the trial court instructed the jury that it could not find that appellant killed Mendez or Lopez unless he was the direct cause of their deaths. The court also stated that "there can be more than one direct cause…. A defendant's conduct may be a direct cause of death even though his conduct was not the last or immediate cause of death …. if it initiates an unbroken chain of events leading to the death of the victims." *Id.* at 797. Thus, given the facts and circumstances surrounding the death of Lopez and the trial court's "direct cause" charge, appellant cannot establish that he was prejudiced by any alleged error in the accomplice liability charge as it relates to the murder of Lopez.

well as representing Pazuhanich for purposes of his disciplinary proceedings. Attorney Anders did not disclose to appellant that he was representing Pazuhanich.

Appellant now argues that trial counsel's subsequent representation of the former prosecutor constituted an undisclosed conflict of interest. Appellant claims that this supposed conflict was so severe that we must presume that it operated retroactively at trial to prejudice him. According to appellant, trial counsel's representation of Pazuhanich divided his loyalties, such that he could not fulfill his duties to both clients.

While appellant claims that prejudice should be presumed under these circumstances, in the alternative he also offers that the conflict adversely affected trial counsel's performance. The reasoning is convoluted. Specifically, appellant speculates that this alleged post-trial conflict must have caused counsel not to use information from Pazuhanich's subsequent arrest to show that Pazuhanich was biased against female jurors, in support of the jury selection claims—even though those claims did not exist until current counsel raised them at the PCRA level. Appellant also offers that, through his representation, counsel learned of Pazuhanich's alcohol and drug addiction problems, as Pazuhanich was immediately placed in a rehabilitation facility after his arrest; appellant then says that this information could have been used to demonstrate that Pazuhanich was biased against drug dealers, such as appellant.

Appellant also complains that the PCRA court erroneously denied his discovery request relating to the Pazuhanich prosecution once appellant established that trial counsel represented appellant and Pazuhanich simultaneously. According to appellant, the PCRA court's denial of discovery precluded him from discovering, developing and presenting facts that could have supported his conflict claim. More specifically, during the PCRA proceedings, appellant requested discovery of all records regarding the arrest and prosecution of Pazuhanich. The PCRA court denied the request on the basis that the arrest and conviction of Pazuhanich did not occur until one year after appellant's trial and conviction and that prosecution was "totally unrelated" to appellant's case. The court also

stated that appellant failed to establish that the information was exculpatory or relevant to his PCRA claims. PCRA Court Opinion, at 65.

Appellant pursued this claim in his questioning of trial counsel Anders at the PCRA hearing. Attorney Anders testified that he conducted some preparatory investigation on the Pazuhanich case, but that counsel from Philadelphia entered the matter soon after and he was off the case until "a week before his trial when he [Pazuhanich] came to me and wanted me to review the case...." Trial counsel then negotiated the plea for Pazuhanich. Counsel stated unequivocally that his involvement was only "in the very beginning and at the end." Counsel testified that he never advised appellant of his representation of Pazuhanich. The PCRA court also clarified when Pazuhanich's term as District Attorney ended, stating that "from the public records it was December 31st of that year" and that trial counsel appeared on Pazuhanich's behalf in Luzerne County (for purposes of entering the plea) the following year (in July). N.T., 3/7/07, at 35–37.

The PCRA court held that the overlapping representation of Pazuhanich and appellant involved totally unrelated matters and that the representation of one client did not adversely affect the representation of the other. As to appellant's claim that Pazuhanich's substance abuse may have affected the prosecution of appellant and somehow could have been explored on direct appeal, the PCRA court concluded that appellant did not provide any factual basis for his claim.

This Court has held that an appellant cannot prevail on a preserved conflict of interest claim absent a showing of actual prejudice. We presume prejudice when the appellant shows that trial counsel was burdened by an "actual"—rather than mere "potential"—conflict of interest. To show an actual conflict of interest, the appellant must demonstrate that: (1) counsel "actively represented conflicting interests"; and (2) those conflicting interests "adversely affected his lawyer's performance." *Commonwealth v. Collins*, 598 Pa. 397, 957 A.2d 237, 251 (2008). Clients' interests actually

conflict when "during the course of representation" they "diverge with respect to a material factual or legal issue or to a course of action." *Id.* Additionally, in *Commonwealth v. Carpenter*, 555 Pa. 434, 725 A.2d 154, 167 (1999), this Court concluded that an appellant could not establish an actual conflict of interest where his direct appeal counsel accepted a position with the district attorney's office after the appeal had been briefed and the case was argued to this Court.

■ In this case, Attorney Anders' overlapping representation of Pazuhanich and appellant occurred during a very limited time, although the time was more significant than in *Carpenter*, since counsel undertook representation of Pazuhanich just before appellant's case was orally argued to this Court.[33] However, the overlap did not occur during trial or even when counsel prepared the direct appeal brief. Rather, it occurred after that brief was filed and during the five days before the case was to be orally argued before this Court. Thus, appellant's claim is frivolous to the extent he alleges that the overlapping representation affected his trial, or even the written presentation of his claims on direct appeal. Any viable claim must be directed at counsel's actions or omissions after he began his representation of Pazuhanich. Obviously, it is troubling that counsel represented Pazuhanich at all while he was still representing appellant, and counsel, at the very least, should have disclosed this fact to appellant.[34] However,

33. Notably, Anders did not orally argue appellant's direct appeal to this Court. Instead, oral argument was by co-counsel, Ellen Schurdak, Esquire. It appears that Ms. Schurdak was also involved in the Pazuhanich case. *See* N.T., 3/7/07 at 34.

34. Appellant also cites this Court's Rules of Professional Conduct as further evidence of counsel's conflict. Pa.R.P.C. 1.7 defines conflict of interest for purposes of defining a lawyer's responsibilities, and prohibits a lawyer from representing a client if the representation will be directly adverse to another client. Subsection (b)(4) excuses a conflict of interest where each client gives informed consent to the representation. As noted herein, appellant was never informed of counsel's representation of Pazuhanich.

The Rules of Professional Conduct are most often employed in attorney disciplinary proceedings. While they can be used to demonstrate that counsel's conduct fell below some well-established standard, in this case, we need not turn to the Rules as our conflict of interest case law is

the mere existence of an overlap in representation does not prove that counsel's representation of Pazuhanich adversely affected appellant's interest.

Significantly, at the time counsel undertook representation of Pazuhanich, the direct appeal issues to be pursued were already determined and briefed. Counsel raised no *Batson* issue at trial or in the direct appeal brief and a *Batson* issue could not have been raised after Pazuhanich was arrested even if counsel had made an abstract leap, connecting the accusations against Pazuhanich with his use of peremptory strikes against female jurors. Moreover, as discussed previously, there was no indication other than mere (select) numbers that Pazuhanich employed peremptory challenges in a gender-biased manner. And, finally, despite appellant's speculations, it is not self-evident that the crimes with which Pazuhanich was charged establish that the person would unconstitutionally discriminate against adult female jurors.

Appellant's speculative claim based on Pazuhanich's substance abuse—which amounts to a claim that counsel was obliged to violate Pazuhanich's confidence to construct a claim—is similarly unavailing. Appellant declares that Pazuhanich's substance abuse problems "could well have affected his handling of the prosecution of appellant" because appellant was a drug dealer. *See* Brief of Appellant at 66. Setting aside that this is another leap in logic that is not at all self-evident, appellant points to nothing in his prosecution that demonstrates Pazuhanich's anti-drug dealer bias. Moreover, there is no requirement that prosecutors must like drug dealers before they prosecute them for murder. In any event, long before Pazuhanich prosecuted appellant, he had confessed to the killings; and a jury then found him guilty, following sworn testimony in which he again admitted his role. Irrespective of their personal beliefs about drug dealers, most if not all prosecutors faced with a double homicide and a confession will bring charges.

well developed and is nearly identical to the conflict provision contained in the Rules.

We turn briefly to appellant's assertion that the PCRA court improperly denied discovery of files relating to Pazuhanich's arrest and prosecution, so that he could better develop his ineffective assistance claim arising from the supposed conflict of interest. The PCRA court found such information, from an unrelated criminal case, was unlikely to contain any exculpatory or otherwise relevant information. Our review of the record indicates that appellant has not demonstrated that this discovery request was anything other than a fishing expedition—there is no indication that anything in these files, from an unrelated prosecution, in another county, a year after appellant's trial, would be exculpatory or otherwise relevant to this matter, which had already been briefed on appeal by the time of Pazuhanich's arrest. Moreover, the prosecution of Pazuhanich in Luzerne County was unrelated to his prosecutorial duties in Monroe County. Thus, the PCRA court did not abuse its discretion in denying appellant's request for discovery of these files.

## 9. INCOMPLETE TRANSCRIPT

Appellant, noting that the sidebars at trial were not transcribed, claims that this fact deprived him of his right to an adequate review of his trial on direct appeal. Appellant states that a deprivation of the full transcript abridges the right of appeal and rendered his direct appeal meaningless. Appellant also notes that the death penalty statute mandates that this Court review the complete proceedings of a capital case to correct errors. According to appellant, the absence of transcribed sidebars deprived the Court of the ability to discharge its obligation to independently review the sentences of death. Similarly, appellant contends that the absence of a "full" transcript deprived him of his right to an independent review of his sentencing to determine whether the verdict was arbitrary. Appellant argues that the substance of the various sidebars is essential to evaluate counsel's conduct and the soundness of the trial court's rulings. Appellant also contends that trial counsel was ineffective because he believed that he could not request the transcription when the lower court did

not wish to have it done and avers that counsel did not have a strategic reason for failing to preserve this issue at trial and pursue it on direct appeal.

The Commonwealth argues that the Pennsylvania Rules of Criminal Procedure do not prohibit sidebar proceedings from being held off the record.[35] Further, the Commonwealth contends that appellant does not identify any potentially meritorious challenge which he was unable to pursue because of the supposedly incomplete transcript.

During the PCRA proceedings, counsel was asked about the alleged "large number of instances" where sidebar conferences were not transcribed. Counsel responded, "I don't know if it was th[is] trial or the last one where I asked for the court stenographer to come up at sidebar and I was told I could not do that." The Court then interjected, "not by this judge; you were not told." To which counsel responded, "Yes, I was." When asked by the PCRA court, "which trial?," counsel then stated, "It was—Powell." Counsel further added that it was not his practice to seek to have all sidebars transcribed; rather, "it depends on what is being discussed." N.T., 3/7/07, at 47–49.

The PCRA court found that "off-the-record and sidebar conferences were either of an administrative nature or were not relevant to matters of record." PCRA Court Opinion, 10/11/07, at 68. The court also observed that counsel could have placed any objections into the record, and there was no indication that the court had ever denied counsel the opportunity to place any argument or objections that were raised at sidebar on the record. Finally, the court had previously noted at the PCRA hearing that "if it had been matters of consequence it would have been transcribed. If it was a matter of

**35.** Rule 115 provides that, "[i]n court cases, after a defendant has been held for court, proceedings in open court shall be recorded." Pa. R.Crim.P. 115(A). However, both the Commonwealth and the PCRA court rely on the Superior Court's decision in *Commonwealth v. Montalvo*, 434 Pa.Super. 14, 641 A.2d 1176 (1994), which held that "nothing in [Pa.R.Crim.P. 115(A)] prohibits the trial court from conducting off-the-record sidebar discussions." *Id.* at 1185.

court record, it was put on the record. Side conferences between counsel were not." N.T., 3/7/07, at 48.

Insofar as appellant raises a claim of trial court error in failing to transcribe sidebar conferences, it is waived because appellant failed to raise this issue at trial and on direct appeal. *See Commonwealth v. Marshall*, 571 Pa. 289, 812 A.2d 539, 551 n. 14 (2002) (incomplete transcript claim must be raised on direct appeal). To the extent appellant raises this claim as one of trial counsel's ineffectiveness, he has failed to establish the merit of the claim.

The U.S. Supreme Court has recognized that adequate and effective appellate review is impossible without a trial transcript or adequate substitute and has held that the States must provide trial records to indigent inmates. *See Bounds v. Smith*, 430 U.S. 817, 822, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (citing *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956)). This Court has similarly concluded that a criminal defendant is entitled to "a full transcript or other equivalent picture of the trial proceedings" in order to engage in meaningful appellate review. *Id.* at 551 (*quoting Commonwealth v. Shields*, 477 Pa. 105, 383 A.2d 844, 846 (1978)). However, in order to "establish entitlement to relief based on the incompleteness of the trial record, [appellant] must first make some potentially meritorious challenge which cannot be adequately reviewed due to the deficiency in the transcript." *Id.*

 Appellant spends much time developing his claim in terms of federal law in order to establish his right of appeal and his right to independent appellate review of his sentence. Appellant also stresses that federal law requires a "full and accurate" record of the proceedings. This Court does not disagree with these well-settled precepts. Indeed, they are mirrored in our case law. *See Shields, supra.* Yet, it is clear that the federal case law appellant invokes is inapposite: it is directed at guaranteeing an indigent defendant with a full transcript, an argument not raised herein. Appellant goes too far when he extrapolates that a "full and accurate" record

includes all sidebars, regardless of their substance. Appellant has cited to no controlling federal or state authority, in existence at the time of trial, which required the court to transcribe all sidebar conferences.

Both the PCRA court and counsel believed that not all sidebars require transcription. Both appeared to agree that where the matter concerned a matter of consequence, it would be transcribed. Existing decisional law from the Superior Court supported this view. During the PCRA proceedings, appellant touched upon the transcription issue, but when counsel responded that a request for transcription depended upon "what is being discussed," appellant did not follow up on counsel's response by pointing to instances in the trial record where counsel could have or should have requested transcription. Again, appellant cites no authority from this Court or any other court for his absolutist proposition that counsel is constitutionally required to request transcription of each and every sidebar. Nothing in the federal constitution or governing law requires states to needlessly waste money to transcribe the inconsequential.

Moreover, this Court has recently rejected a similar broad-based challenge to appellate review of capital sentencing based on the absence of *voir dire* transcripts, explaining that "to be entitled to relief due to the incompleteness of the trial record the defendant must make some potentially meritorious challenge which cannot be adequately reviewed due to the deficiency in the transcript." *See Commonwealth v. Lesko,* 609 Pa. 128, 15 A.3d 345, 411 (2011) (citing *Commonwealth v. Marinelli,* 589 Pa. 682, 910 A.2d 672, 688 (2006)).

In this case, appellant fails to specify any potentially meritorious claim which cannot be adequately developed or reviewed because the sidebars were not transcribed. Nor has appellant identified, through indications in the of-record proceedings—including the actual evidence, rulings, and the jury charge—issues that were of substance that were resolved at sidebar. Instead, he simply declares that "significant portions" of the trial proceedings were not transcribed. That assertion lacks any factual predicate. Accordingly, appellant has failed to

prove that counsel was ineffective for failing to pursue this objection.

## 10. CUMULATIVE ERROR

Appellant last argues that the cumulative effect of errors in his case entitles him to relief. This Court has repeatedly emphasized "no number of failed claims may collectively warrant relief i[f] they fail to do so individually." *Rainey,* 593 Pa. 67, 928 A.2d 215, 245 (2007). However, we have more recently recognized that "if multiple instances of deficient performance are found, the assessment of prejudice properly may be premised upon cumulation." *Commonwealth v. Johnson,* 600 Pa. 329, 966 A.2d 523, 532 (2009)(citing *Commonwealth v. Perry,* 537 Pa. 385, 644 A.2d 705, 709 (1994)). We cited lack of prejudice in addressing appellant's claim of trial counsel ineffectiveness for failing to present evidence in support of his imperfect defense claim as well as an alternative ground for denying appellant's claim of trial counsel ineffectiveness related to the self-defense jury instruction. We are confident that there is no cumulative error claim warranting relief as these claims involve entirely disparate inquiries. Additionally, even cumulating these claims, we have no doubt that the outcome of the guilt phase proceedings would have been the same given the overwhelming evidence of guilt, including appellant's several confessions to the police. Furthermore, while we are remanding for the PCRA court to consider the prejudice inquiry related to appellant's mitigating evidence claim, this claim relates only to the penalty phase of appellant's trial and we do not need to consider the cumulative effect of the errors from the separate phases of appellant's trial.

## C. MANDATE AND PROCEEDINGS UPON LIMITED REMAND

One further administrative matter remains. As we have noted above, the FCDO simply entered its appearance in this case to represent appellant in his state postconviction challenge. The FCDO filed a petition for a writ of *habeas corpus*

on appellant's behalf in the U.S. District Court for the Middle District of Pennsylvania on December 4, 2006. The PCRA court notes in its opinion that federal counsel were appointed by a federal district court judge to file a federal *habeas corpus* petition; instead, the FCDO proceeded to Pennsylvania state court. The federal proceedings have been stayed pending resolution of appellant's PCRA claims.

Appellant is represented by three FCDO lawyers: Michael Wiseman, Esquire, Keisha Hudson, Esquire, and Elizabeth Larin, Esquire. Attorney Wiseman is lead counsel and he signed the brief. Recently, in another capital matter, *Commonwealth v. Abdul–Salaam*, 42 A.3d 983 (Pa.2012), the FCDO withdrew its appearance and advised that Attorney Wiseman, lead counsel there too, would be representing Abdul–Salaam on a *pro bono* basis, listing a private address for Wiseman. No such notice has been entered here. It is unclear whether Attorney Wiseman remains a member of the FCDO for some cases, while acting as *"pro bono"* counsel in other cases. If federal funds were used to litigate the PCRA below—and the number of FCDO lawyers and witnesses involved, and the extent of the pleadings, suggest the undertaking was managed with federal funds—the participation of the FCDO in the case may well be unauthorized by federal court order or federal law. Accordingly, on remand, the PCRA court is directed to determine whether to formally appoint appropriate post-conviction counsel and to consider whether the FCDO may or should lawfully represent appellant in this state capital PCRA proceeding. *See* 18 U.S.C. § 3599(a)(2) (authorizing appointment of counsel to indigent state defendants actively pursuing federal *habeas corpus* relief from death sentence).

Based on the above review of the claims raised on appeal, the order of the PCRA court is affirmed insofar as it dismissed all claims other than that of ineffective assistance of counsel associated with the investigation, development, and presentation of mitigation evidence. With respect to this claim, the PCRA court's order is vacated, and the matter is

remanded for further consideration consistent with this Opinion.

Jurisdiction is relinquished.

Justice ORIE MELVIN did not participate in the consideration or decision of this case.

Justice BAER and McCAFFERY join the opinion.

Justice SAYLOR files a concurring opinion in which Justice TODD joins.

Justice EAKIN files a concurring and dissenting opinion.

Justice SAYLOR, concurring.

I join the substantive analysis and holdings in Parts A, B(1)(a), B(2)-(6), B(7)(a)(b), and B(8)-(10) of the majority opinion, albeit I do not fully support some of the collateral characterizations and commentary. I concur in the result as to the balance of the opinion and offer the following explanations concerning my reasoning.

## A. The Remand Determination

Regarding Part B(1)(b), left to my own devices, I would simply award a new penalty hearing at this stage based on trial counsel's deficient stewardship in failing to conduct an adequate penalty investigation. I acknowledge that the majority's approach of remanding for an appropriate determination by the post-conviction court in the first instance is a reasonable one. In my judgment, however, in light of the age of this capital litigation—and in the hemisphere of the many others similarly situated—justice would be better served by a present resolution per the applicable *de novo* review standard. *See Commonwealth v. Sattazahn*, 597 Pa. 648, 677 & n. 10, 952 A.2d 640, 657 & n. 10 (2008).

I recognize that this *de novo* review standard is tempered by deference accorded to PCRA court factual findings, particularly where, as here, the PCRA judge also presided at trial. *See id.* Indeed, it was partly in light of the presences of material, disputed issues of fact that the Court remanded in

the case cited by the majority, namely, *Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110 (2008).

Presently, however, I do not see that there are particular, material factual matters needing to be resolved at this stage. *Compare, e.g., Gibson*, 597 Pa. at 422, 951 A.2d at 1122 (identifying deficiencies in the development of the factual record and credibility matters in need of resolution). Additionally, as amply reflected in the majority opinion, to date the PCRA court has not performed adequately in its review of the present case; rather, in a number of material respects, such review has been cursory. *See, e.g.,* Majority Opinion, *op.* at 294–99, 55 A.3d at 1128–31. Furthermore, it is now established that trial counsel's deficient performance resulted in the omission of material and weighty mitigation from the review of Appellant's capital sentencing jury. *See, e.g.,* Majority Opinion, *op.* at 298, 55 A.3d at 1130 (reflecting that "Appellant's school records show that he was a poor performer in school with a borderline intelligence," or, in other words, that he is borderline mentally retarded). *See generally See Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989) (explaining that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse" (quoting *California v. Brown*, 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring))); *accord Williams v. Taylor*, 529 U.S. 362, 398, 120 S.Ct. 1495, 1515, 146 L.Ed.2d 389 (2000) (commenting that "the reality that [the defendant] was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability.").

Again, while I do not criticize the majority's preference for a remand, in light of the above, I would render a dispositive judgment at this juncture. My concurrence in the result here is along the lines of the approach taken by Mr. Chief Justice Castille in *Gibson*, 597 Pa. at 465–66, 951 A.2d at 1148 (Castille, C.J., concurring)("In my view, it is a close question

whether the claim of *Strickland* prejudice warrants further hearing, as opposed to summary rejection. My joinder in the remand follows largely out of respect for the care and prudence in the Majority's explanation of the deficiencies in the PCRA court's analysis; the importance of emphasizing to the courts below their duties of precision in capital appeals; and the necessity for a dispositive order where this Court might otherwise be deadlocked in a capital case.").

## B. Response to the Dissent

Next, I wish to respond to the dissenting perspective on this matter, including its assertions that: trial counsel performed reasonably in the penalty phase; there were no "red flags" suggesting investigation of Appellant's mental health; and the majority's reasoning reflects a hindsight-based second-guessing of counsel's performance.

As the majority explains, it appears to be undisputed that the mitigation investigation in this case, such as it was, began two weeks before trial. *See, e.g.,* N.T., Mar. 7, 2007, at 28. At this late stage in the trial preparations, a contract paralegal contacted a clearinghouse for experts, apparently ultimately focusing on psychiatrists Eric M. Fine, M.D. and Paul Gross, M.D. *See* N.T., Mar. 7, 2007, at Ex. D–4. Although time entries indicate some desire to obtain a "mitigation expert," trial counsel's eve-of-trial letters to the identified professionals relate more closely to the guilt phase, as they concern the attempt to negate the element of specific intent to kill. *See* N.T., Mar. 7, 2007, at Exs. D–1, D–2. This was consistent with Dr. Fine's letter-response, which reflects an identical focus. *See id.*[1] Dr. Gross provided an affidavit, admitted into evi-

1. In light of this record, I differ with the dissent's apparent suggestion that there was some mitigation-related consultation with Dr. Fine suggesting against a mental-health evaluation. *See* Dissenting Opinion, *op.* at 349, 55 A.3d at 1160 (indicating that "counsel did consult a mental health expert, Dr. Fine, who reviewed appellant's confession and concluded an in-person evaluation was unnecessary"). Indeed, the post-conviction record confirms the more limited focus of the defense correspondence with this psychiatrist. For example, at the PCRA hearings, the following interchange occurred with Dr. Fine:

Q. . . . [W]hat was [trial counsel's] purpose in contacting you?

dence at the PCRA hearings, affirming that "[i]t is highly unlikely that I could have conducted a proper evaluation of [Appellant] in the time required by [trial counsel]." N.T., Jun. 12, 2007, at Ex. D–14.

The result of counsel's eleventh-hour attempt was a mitigation case consisting only of Appellant's modest criminal record; brief interchanges with two acquaintances who frequented a house in which illicit drugs were sold and used, attesting to Appellant's good and caring nature (especially with the children he watched); and Appellant's own expression of his remorse. *See* N.T., Nov. 25, 2002, at 861–71. As counsel's closing remarks concerned the mitigation case, in their entirety, they were as follows:

> My client has had two misdemeanors for, I believe, it was possession of marijuana. That is a lot different than selling cocaine, selling heroin and selling marijuana to people who are addicted to the use of those drugs for financial gain.
>
> Two individuals came here today and told you what my client's character was like. He was an individual who took care—he didn't sit around the house—these people didn't say he sat around the house all day. They said he took care of the children. [One witness] even had him go to her house to take care of the children.
>
> We are told today and told before that [Appellant] worked until he was fired. And after he was, he contributed rent until he was fired to the household. And after that he was

A. Well, he contacted me because I am defined as an addiction psychiatry expert witness. . . . [H]e wanted me, if I could, [to] provide an opinion regarding the state of mind of [Appellant] at the time of the offense.

Q. And did he ask you, if you recall, to conduct a person to person evaluation, clinical evaluation, of [Appellant] at that time?

A. There was no request that I see [Appellant]. It was specifically to deal with [the] material provided to me referred to in terms of [Appellant's] use of cocaine.

Q. And is it your normal practice to render psychiatric opinions or diagnoses without conducting an actual evaluation of the subject?

A. If I am requested to do a psychiatric evaluation I insist on seeing the patient in order to arrive at a diagnosis.

N.T., Jun. 11, 2007, at 108.

the caretaker for the children during the day and at night. Children that he loved.

The testimony about the argument about him going up, if he really loved children, why did he take the weapon and go upstairs. I think that testimony was contradicted by [a trial witness] who told you that it was Mr. Heleva who chased Mr. Mendez upstairs with the gun and my client followed.

Ladies and Gentlemen, based upon the testimony of the witnesses today, my client acted out of character that night. He acted rashly; he acted imprudently; and, in fact, reacted when he should not have reacted in that manner. That has been established.

But I would submit to you based upon the testimony of the two witnesses today, justice requires that you return a verdict of life imprisonment.

N.T., Nov. 25, 2002, at 893–94.

I maintain grave concerns with the quality of the stewardship we have seen in a number of the capital post-conviction cases, including the present one. As otherwise related, in addition to Axis I mental-health disorders, there is uncontradicted postconviction evidence that Appellant has very limited intellectual functioning or—in other words—is borderline mentally retarded. *See* N.T., Jun. 11, 2007, at 63 (testimony of psychiatrist Pablo Stewart, M.D.); N.T., Jun. 12, 2007, at 49, 57 (testimony of neuropsychologist Antonio Puente, Ph.D.). Indicators were apparent from the face of Appellant's school records, which counsel never obtained. *See id.* at 51; N.T., June 13, 2007, at 39 (reflecting the testimony of psychiatrist Richard Dudley, M.D., that "given the deficits that were evidenced in the school records and also the behavioral symptoms evidenced in the school records[,] a full mental health evaluation, to find out what is going on, would be warranted"). Again, the United States Supreme Court has recognized that this type of information can be critical to a reasoned moral judgment by a capital sentencing jury. *See Penry v. Lynaugh*, 492 U.S. at 319, 109 S.Ct. at 2947; *accord Williams*, 529 U.S. at 398, 120 S.Ct. at 1515. However, because trial

counsel did not know of it, it never entered into his strategic calculus.

The dissent offers a different portrayal of the record in this case, downplaying the timing of counsel's efforts; stressing Appellant's resistance to burdening family members with attendance at his trial; and concluding that there simply was no basis for further inquiry of a mental-health professional, or, in other words, there were no "red flags." *See* Dissenting Opinion, *op.* at 346–50, 55 A.3d at 1159–61.

In terms of the belatedness issue, I believe that decisions of the United States Supreme Court and of this Court reflect that the failure to prepare in a timely fashion is a strong indicator of deficient stewardship. *See, e.g., Williams v. Taylor*, 529 U.S. at 395, 120 S.Ct. at 1514 (commenting on late preparation—beginning a week before trial—as a factor in finding penalty-phase ineffectiveness); *Commonwealth v. Perry*, 537 Pa. 385, 392, 644 A.2d 705, 709 (1994) ("It is not possible to provide a reasonable justification for appearing in front of a death penalty jury without thorough preparation."). As such, I do not agree that it should play no role in evaluating the merits of Appellant's claim of deficient stewardship here.

As to the attribution of fault to Appellant, I do not appreciate how his instinct not to burden family members prevented counsel from obtaining a single document relevant to Appellant's life history or mental-health condition, such as Appellant's school records or the records concerning Appellant's incarceration.[2] Indeed, once the mitigation inquiry finally

2. The dissent opines that trial counsel had no reason to review Appellant's prison records and such review was contrary to Appellant's wishes. *See* Dissenting Opinion, *op.* at 348–50, 55 A.3d at 1160–61. The former reason relates to the absence of "red flags," which I address in the text below. Moreover, as Appellant observes, favorable adjustment to the prison environment is a well-known mitigating factor. *See Skipper v. South Carolina*, 476 U.S. 1, 7 & n. 2, 106 S.Ct. 1669, 1672 & n. 2, 90 L.Ed.2d 1 (1986) (explaining that "a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination") (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (emphasis in original)). Thus, a

commenced, a contract paralegal was able to elicit basic historical information from Appellant including the locations of his upbringing. *See* N.T., Mar. 7, 2007, at Ex. D–3. It was left unexplained, in the post-conviction hearings, why trial counsel himself had such greater difficulty.[3]

In terms of the absence of "red flags," the dissent refers to a selected passage from the cross-examination of Dr. Puente in the post-conviction hearings. *See* Dissenting Opinion, *op.* at 349, 55 A.3d at 1160. This passage is in strong tension with the overall purport of Dr. Puente's testimony, related to a specific hypothetical previously posed on direct examination, and appears to reflect some confusion on the doctor's part. Such confusion was addressed on redirect examination as follows:

> Q. I am not sure I understood one of the answers you gave [on cross-examination]. Just so we are clear, I want to read you a paragraph that has been read before since there's some confusion in the responses. There is a memo from the trial lawyer's paralegal [that] says quote "[Appellant] was eight years old when his mom and dad split up. His mother took off with the children because of the violence from his father, who was an alcoholic.
>
> His father smacked his mom around a lot and in retaliation apparently the mother smacked the father around. He did hit the children occasionally; once the father hit [Appellant's] sister so hard he broke her tooth and she

purported absence of mental-health "red flags" should not obviate a capital defense attorney's review of available prison records.

The latter reason (Appellant's purported refusal to condone any investigation into his background) apparently is extrapolated from counsel's discussion of Appellant's desire not to involve his family in the trial proceedings. *See* Dissenting Opinion, *op.* at 346–49, 55 A.3d at 1159–60. Appellant's concerns about his family, however, have nothing to do with prison records. Moreover, counsel's attestation that because of Appellant's wishes he had no "information as to where I could locate ... background records," N.T., Mar. 7, 2007, at 18, certainly cannot extend to the records of Appellant's confinement on pending charges.

3. Counsel's time records show limited interaction (two three-quarter hour and two hour-long conferences with Appellant) in the eight months preceding the meeting with the contract paralegal. It is unclear from the records how much of this time was in person.

had to go to the hospital. Due to that incident, her mother hit him over the head with a baseball bat. . . . Now, if that is the information [Appellant] apparently gave to his trial lawyer through the paralegal. If you had that information and knew nothing else about [Appellant's] background and that information was presented to you as a forensic mental health professional, what suggestions would you have for the lawyer.

A. I would say [Appellant] needed to hire a psychiatrist as soon as possible.

Q. And why?

A. Because you need to examine the potential impact that this report has been provided to us or to you, what impact they may have. What impact or eventual conduct, personality and ability to think.

Q. And if Mr. Hypothetical lawyer said in response but my client won't tell me anything more about his childhood, what would you say?

A. Okay. Bring in someone who speaks Spanish. Bring in someone with a different cultural background and talk about black beans and salsa music for a few hours and eventually you will get there.

Q. And how about bringing in someone with a mental health background?

A. Well, obviously. I mean that is just an understatement.

N.T., Jun. 12, 2007, at 79–80. Appellant's other post-conviction experts testified consistently. *See, e.g.,* N.T., Jun. 11, 2007, at 54 (reflecting Dr. Stewart's testimony that the same hypothetical represented a clinically significant level of family dysfunction and childhood abuse).[4]

4. The dissent's assertion that Dr. Stewart "admitted someone without mental health training would not be able to notice appellant's indicia of PTSD," Dissenting Opinion, *op.* at 349, 55 A.3d at 1160, seems to me to be a loose extrapolation from the record. Furthermore, the observation is of very limited relevance to the salient question whether counsel was presented with sufficient information to suggest a mitigation-related evaluation by a qualified mental-health professional. In this regard, contrary to the tenor of the dissent, Dr. Stewart consistently testified

As of the time of Appellant's trial in 2002, it was well understood in the training readily available to capital defense attorneys that potential mental-health issues are essentially ubiquitous in capital cases, and that childhood abuse and deprivations may substantially impact personality, cognition, and behavior. Moreover, the bizarre circumstances of Appellant's crimes (in which one of the victims was hacked to death with a weapon fashioned from an axe handle and a metal disk, and where the bodies of both victims appear to have been arranged in positions of humiliation) are alone enough to suggest the involvement of a mental-health professional. *Cf. Commonwealth v. Gorby*, 589 Pa. 364, 391, 909 A.2d 775, 791 (2006) (commenting on a defendant's irrational behavior after his crimes as an indicator of possible mental-health involvement). Furthermore, defense time records evidence that retention of a "mitigation expert" was being pursed, and trial counsel contemporaneously hypothesized to Dr. Fine that his client may have been psychotic. *Accord* Brief for Appellant at 42 ("That counsel did not have a strategic reason for failing to conduct this type of mitigation investigation is borne out by the fact that **he embarked upon it,** albeit, too little, too late." (emphasis in original)). On this record, I find very little support for the perspective that there were no "red flags" suggesting the involvement of a mental-health professional.

This and records from other capital cases also amply reflect what is necessary to conduct an effective penalty-phase investigation entailing the collection and examination of sensitive, personal information. The interviewer obviously needs to develop some level of rapport and trust, and the expenditure of time and a degree of persistence is required. *See* N.T., Jun. 12, 2007 (testimony of Dr. Puente). Particularly in light of potential intellectual, mental, and emotional barriers, which may be exacerbated by an impoverished upbringing and childhood abuse, it may be that the necessary inroads should be made via the timely involvement of a mental-health professional. Plainly, in the absence of extraordinary circumstances, the

that records available to counsel presented "huge red flags." N.T., Jun. 11, 2007, at 83.

investigation needs to begin earlier than two weeks before trial.

Additionally, I believe the presumption of effectiveness of counsel should not be applied with such blunt force as to obliterate these sorts of basic realities of capital representation.[5] Notably, the United States Supreme Court has expressed "insistence that capital punishment be imposed fairly, and with reasonable consistency, or not at all." *Eddings*, 455 U.S. at 112, 102 S.Ct. at 875. I do not see how consistency can be achieved by tolerating such a wide range of disparate performance on the part of capital counsel, so that some may assiduously apply existing and well-developed professional guidelines for the investigation and presentation of mitigating evidence; whereas others may simply do nothing in the face of an initial reluctance on the part of the client to support some facet of the necessary investigation, or simply wait so long to begin that effective preparations are foreclosed.

In the present case, it is my position that the absence, due to an inadequate investigation, of substantial, relevant, mitigating evidence diminishes confidence in the outcome of the sentencing proceeding, particularly given the appropriate single juror frame of reference. *See Wiggins v. Smith*, 539 U.S. 510, 537, 123 S.Ct. 2527, 2543, 156 L.Ed.2d 471 (2003) (articulating the prevailing standard for assessing prejudice from deficient stewardship in the presentation of mitigation evidence in terms of whether "there is a reasonable probability that at least one juror would have struck a different balance").

### C. The *Huffman* Issue

Concerning Part B(7)(c) of the majority opinion, the majority finds Appellant's claim of a defective accomplice liability instruction to be defaulted based inadequacies in factual development and presentation in the appellate briefing. *See* Majority Opinion, *op.* at 318–22, 55 A.3d at 1142–44. As of the time

5. In this regard, I also reiterate my concern that some of the problems we are seeing may be a result of systemic issues, such as underfunding. *See Commonwealth v. Martin*, 607 Pa. 165, 217, 5 A.3d 177, 208 (2010) (Saylor, J., concurring and dissenting); *cf. Commonwealth v. Ly*, 605 Pa. 261, 262–65, 989 A.2d 2, 2–5 (2010) (Saylor, J., dissenting).

of Appellant's trial in 2002, however, the decision in *Common-wealth v. Huffman*, 536 Pa. 196, 638 A.2d 961 (1994), governed.[6] *Huffman* concerned accomplice liability instructions failing to specifically convey the requirement that, to be convicted of first-degree murder as an accomplice, the defendant must be found to have had the specific intent to kill. *See id.* at 198–99, 638 A.2d at 962. The Court deemed such an unqualified instruction to be a "patently erroneous statement of the law" resulting in a "miscarriage of justice." *Id.* at 198–99, 201, 638 A.2d at 962–63. Prior to *Huffman*'s effective overruling, I do not see that there would be any reasonable strategic basis for a trial attorney defending against a potential death sentence to fail to insist on closely qualified accomplice liability instructions. Accordingly, I find counsel's present argumentation and the record to be sufficient to implicate merits review.

I have no wish to resurrect the *Huffman* debates, which have spanned the better part of a decade of this Court's jurisprudence. My own thoughts concerning the substantive law are set forth in my dissents in *Commonwealth v. Cox*, 581 Pa. 107, 146–51, 863 A.2d 536, 558–62 (2004) (Saylor, J., dissenting), and elsewhere. For present purposes, I recognize that, as a matter of state law, *Huffman* effectively has been overruled, such that instructions such as those given in this case are now deemed by this Court to be entirely proper ones.

The difficulty, however, is that the Third Circuit Court of Appeals appears to take an entirely different view as a matter of federal due process law. *See Laird v. Horn*, 414 F.3d 419, 425–30 (3d Cir.2005). Thus, unless and until the relevant state/federal divide is addressed by the United States Supreme Court, the issuance of unqualified accomplice liability instructions in first-degree murder cases in the Pennsylvania courts risks a needless waste of untold resources on the part of the Commonwealth, defense attorneys, and the courts.[7]

6. At least to my reading, *Huffman* was effectively overruled by a majority of the Court as of the 2004 decision in *Commonwealth v. Speight*, 578 Pa. 520, 536–39, 854 A.2d 450, 459–61 (2004). *See generally id.* at 543–45, 854 A.2d at 463–65 (Saylor, J., concurring).

7. I do note that there are some nuanced differences between the instructions issued in Appellant's case and those at issue in *Laird* which

Accordingly, when issuing an accomplice liability charge in a first-degree murder case, trial courts should be admonished to clarify—very specifically—that to be convicted of first-degree murder *under accomplice theory, as a co-conspirator,* or otherwise, a defendant must be found to possess the requisite specific intent to kill.[8] I believe the Court should require issuance of such instructions under its supervisory power, and that they should be integrated comprehensively into mandatory jury instructions.

Justice TODD joins this concurring opinion.

Justice EAKIN, concurring and dissenting.

I respectfully disagree with the majority's decision to vacate and remand to the PCRA court for inquiry into prejudice with respect to appellant's claim of ineffective assistance of counsel concerning the investigation, development, and presentation of mitigation evidence in the penalty phase. In all other aspects, I join the majority.

The majority finds counsel's performance deficient, "considering the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, the additional or different mitigation evidence that could have been discovered and presented, and the Commonwealth's failure to muster any

may impact the federal due process analysis. Additionally, even if the instruction in this case was erroneous per the Third Circuit's approach, I agree with the majority that the error should be deemed nonprejudicial for the reasons which it outlines. *See* Majority Opinion, *op.* at 321–24, 55 A.3d at 1144–45.

Nevertheless, my present point is that all of the nuances, difficulties, risks, uncertainties, and resources expenditures can be obviated through the issuance of more straightforward instructions specifically clarifying that the requirement of specific intent to kill for first-degree murder extends across the range of accomplice, conspiracy, accessorial liability theories.

8. While this concern pertains in the capital litigation arena, applicable *mens rea* requirements should be conveyed in clear terms to the jury relative to any and all theories of criminal liability across the range of offenses. *See, e.g.,* 18 Pa.C.S. § 306(d)(providing that, to support accomplice liability for offenses where a particular result is an element, the defendant must have acted with the kind of culpability with respect to that result that is sufficient for the commission of the offense).

relevant argument in defense of counsel's performance[.]" Majority Op., at 299, 55 A.3d at 1130. Further, the majority holds the result concerning prejudice is not self-evident in this case; thus, a remand is required for the PCRA court to conduct a prejudice inquiry. *Id.*, at 300, 55 A.3d at 1131. As I believe appellant's ineffectiveness claims associated with the investigation, development, and presentation of mitigation evidence in the penalty phase must fail, I cannot join the majority's decision regarding counsel's deficient performance, and thus, cannot join the decision to remand.

In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the United States Supreme Court held capital counsel has an obligation to thoroughly investigate and prepare mental health and other mitigating evidence. *Id.*, at 395–96, 120 S.Ct. 1495. Counsel cannot meet this requirement by relying on "only rudimentary knowledge of [the defendant's] history from a narrow set of sources." *Wiggins v. Smith*, 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Further, this Court has previously noted:

Under prevailing constitutional norms as explicated by the United States Supreme Court, capital counsel has an obligation to pursue all reasonable avenues for developing mitigating evidence. Counsel must conduct a thorough pretrial investigation, or make reasonable decisions rendering particular investigations unnecessary. Strategic choices made following a less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitation of the investigation. In undertaking the necessary assessment, courts are to make all reasonable efforts to avoid distorting effects of hindsight. Nevertheless, courts must also avoid *"post hoc* rationalization of counsel's conduct."

*Commonwealth v. Williams*, 597 Pa. 109, 950 A.2d 294, 303–04 (2008) (citations and footnote omitted). The United States Supreme Court has further clarified what *Strickland* requires concerning investigation and preparation of penalty phase mitigating evidence:

The Sixth Amendment entitles criminal defendants to ... representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms." That standard is necessarily a general one.... Restatements of professional standards, we have recognized, can be useful as "guides" to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place.

*Bobby v. Van Hook*, 558 U.S. 4, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009) (quoting *Strickland v. Washington*, 466 U.S. 668, 686, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Thus, the Court noted the standard *Williams* and *Wiggins* applied is flexible enough to account for the prevailing professional norms at the time of counsel's performance. *See Strickland*, at 689, 104 S.Ct. 2052 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

Additionally, the reasonableness of counsel's investigation and the presentation of mitigating evidence depend, in large part, on the extent to which appellant assisted counsel's investigation and presentation of mitigating evidence. *See, e.g., Commonwealth v. Tedford*, 598 Pa. 639, 960 A.2d 1, 44 (2008) (" '[C]ounsel has no duty to introduce and argue evidence of mitigating circumstances where his client has specifically directed otherwise.' ") (quoting *Commonwealth v. Sam*, 535 Pa. 350, 635 A.2d 603, 612 (1993)); *Commonwealth v. Rega*, 593 Pa. 659, 933 A.2d 997, 1026 (2007) ("reasonableness ... depends ... [on] ... information supplied by ... defendant"); *Commonwealth v. Rios*, 591 Pa. 583, 920 A.2d 790, 811 (2007) (counsel not ineffective for not providing testimony of defendant's family members when defendant instructed counsel not to present their testimony); *Commonwealth v. Uderra*, 550 Pa. 389, 706 A.2d 334, 340 (1998) ("Appellant's own failure to cooperate with counsel in order to apprise him of allegedly relevant information cannot now provide a basis for ineffectiveness claims.").

Here, the PCRA court found appellant opposed any investigation into his background. This finding is supported by the record. Counsel noted appellant did not wish to involve his family members. Appellant's family members consistently testified appellant did not ask for their assistance, or even inform them of the seriousness of the charges, until after he was sentenced to death. Had appellant wanted counsel to investigate evidence from his background, including the alleged domestic abuse he suffered, it is unlikely he would have instructed counsel not to contact his family while downplaying the severity of the charges against him to his family members. Further, even though Alex Sepulveda, appellant's relative, is an attorney whose family members frequently asked for help with their legal problems, appellant did not once contact him before sentencing. Thus, where appellant consistently opposed investigating his background, I do not believe he has proven counsel was unreasonable in not investigating that background.

Further, the PCRA court concluded counsel had no reason to believe appellant suffered from mental health issues. I would find this conclusion is supported by the record, as Dr. Puente noted the information appellant provided about his background was "not enough to put up a red flag." N.T. PCRA Hearing, 6/12/07, at 74. Further, Dr. Stewart admitted someone without mental health training would not be able to notice appellant's indicia of Post Traumatic Stress Disorder. *See* N.T. PCRA Hearing, 6/11/07, at 93. Thus, it was not obvious to counsel that appellant was suffering from a mental health problem. Further, counsel did consult a mental health expert, Dr. Fine, who reviewed appellant's confession and concluded an in-person evaluation was unnecessary. Accordingly, pursuant to the prevailing professional norms at the time of counsel's performance, I would conclude counsel's " 'decision not to seek more' mitigating evidence from [appellant]'s background, ... fell 'well within the range of professionally reasonable judgments.' " *Bobby*, at 19, 130 S.Ct. 13 (quoting *Strickland*, at 699, 104 S.Ct. 2052).

As to the issue of appellant's pre-trial prison records, the PCRA court concluded these records did not contain any "red flags" because stress from facing trial on capital charges could have caused appellant's symptoms. Although Dr. Stewart noted guilt could have caused appellant's symptoms, appellant's experts consistently testified neither stress nor guilt could have caused appellant's hallucinations. Thus, I would hold the record does not support the PCRA court's conclusion that stress could have caused the symptoms recorded in appellant's pre-trial prison records.

Nonetheless, I do not believe appellant has proven counsel acted unreasonably in not reviewing these records. The PCRA court determined appellant did not demonstrate any obvious signs of mental illness, and Dr. Fine did not inform counsel that appellant had mental health issues. As counsel had no indication appellant suffered from any mental illness, he acted reasonably in not reviewing prison records for signs of an illness he had no cause to believe existed. Additionally, appellant opposed any investigation into his background. Thus, counsel did not have any reason to ignore his own observations of appellant, Dr. Fine's advice, and his client's wishes, by reviewing appellant's prison records in hopes of uncovering signs of mental illness. Accordingly, I would hold appellant has failed to establish counsel was ineffective in not reviewing his prison records.

As a result, I cannot agree counsel's performance was deficient, thus requiring a remand for the PCRA court to conduct a prejudice inquiry. While hindsight always provides this Court with a clear view of the most prudent path counsel could have taken, that path here was blurred for counsel by appellant's lack of cooperation and desire to keep his background and family out of the courtroom. The lack of red flags and reasons to further investigate appellant's pre-trial prison records distorted matters even further. Although we now have a 20–20 view of a better path counsel could have taken, our governing case law instructs us not to be swayed by this view, but rather by the reasonableness of the chosen path. Because I find counsel's pursuit to have been reasonable, I

must respectfully disagree with the majority's decision to remand to the PCRA court.